IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROBERT E. HUNT, JR., | ) | 4:98CV3254 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | |
| ROBERT HOUSTON, Director, | ) | |
| State of Nebraska Department of | ) | |
| Correctional Services, | ) | |
| | ) | |
| Respondent. | ) | |

This matter is before the court on petitioner Robert E. Hunt's Third Amended Petition for habeas corpus relief under 28 U.S.C. § 2254.  Hunt was convicted of first-degree murder in 1984.  He was sentenced to death, but his death sentence was set aside in the direct appeal of his conviction.  *See State v. Hunt,* 371 N.W.2d 708 (Neb. 1985) (*Hunt I*).  He was resentenced to life in prison.  He is presently incarcerated in the custody of respondent Robert Houston, Director of the Nebraska Department of Correctional Services (hereinafter, "the State").

This is a very disturbing case because it strikes at the very heart of the fundamental fairness of our criminal justice system.  It exposes egregious prosecutorial misconduct, conflicted defense counsel, and critical off-the-record proceedings.  It undermines the foundation of our criminal justice system, the right to a fair trial—presided over by an unbiased magistrate and tried by competent ethical advocates.  At its essence, this system is designed to minimize the conviction of innocent citizens.  Unfortunately, Mr. Hunt's trial was so fundamentally flawed that it is impossible to know whether he is guilty of first-degree murder or of some lesser offense.  The record reveals that the county attorney charged with prosecuting the case completely fabricated at least a portion of one police

report and asked at least one police officer to likewise fabricate his report, purportedly in an effort to ensure a first-degree murder conviction.  To his credit, the officer, Captain Leon Chapman, refused.  The alteration in the report pertained to Hunt's Sixth Amendment right to an attorney and to the crucial issue of premeditation.

Hunt's lawyer did not demand an investigation of the fabrication, nor did he fully disclose the misconduct to his client.  The evidence shows that defense counsel acted instead to protect a young lawyer's career.  Similarly, the trial judge did not fully explore the misconduct because he claims he was not informed of the magnitude of the prosecutor's violation.  However, in a private, off-the-record meeting in chambers, outside the defendant's presence, the trial judge learned of some level of misconduct, enough that he appointed a special prosecutor.  There is no contemporaneous transcript of the meeting, nor did the trial court later make any on-the-record transcription of the meeting.

No independent investigation was ever undertaken to determine if other relevant evidence had been fabricated by the county attorney or by law enforcement officers less ethical than Captain Chapman.  No independent prosecutor was ever named, either for the defendant or for the citizens of Madison County, who had a right to know of such a fundamental flaw in the operation of its criminal justice system.

The misconduct was not revealed to the Supreme Court of Nebraska on direct appeal or in the defendant's appeal of his first state postconviction action.  Hunt's state postconviction action was heard by the same judge who presided over Hunt's original trial and who failed to disclose the incident of misconduct on the record.  The defendant's postconviction counsel was a public defender whose appointment depended on that same judge.  The State was represented in postconviction proceedings by a Madison County

2

Attorney who had been hired by the very prosecutor who fabricated the police report in question and attempted to suborn perjury. At the time of the postconviction action, the prosecutor whose conduct is at issue had been appointed a county judge, in front of whom the Madison County Attorney regularly appeared.

This court grants the defendant's petition for a writ of habeas corpus because the conduct of the principals of the criminal justice system in place at the time of his conviction was so fundamentally flawed that the result cannot be trusted. Unfortunately, the victim's family and the citizens of Madison County may be subjected to another trial for Mr. Hunt. The court trusts that this time the case can be litigated within the bounds of the law.

## I. BACKGROUND

### A. Facts

#### 1. Trial

In 1985, Hunt was convicted of first-degree murder and sentenced to death for the murder of Beverly Ramspott in Norfolk, Nebraska. *See* Filing No. 16, State Court Record, Case No. 84-797, Bill of Exceptions, Vol. I, Pretrial Motion Hearing Transcript (hereinafter, "Mo. Hr'g. Tr."), Vols. II-IV, Trial Transcript ("T. Tr."). Madison County District Judge Richard Garden presided over the pretrial proceedings and the trial. Attorney Thomas DeLay was appointed to represent Hunt. Richard Krepela, then the Madison County Attorney, initially prosecuted the action. James Smith, a former Deputy Madison County Attorney, was later appointed as special prosecutor. Krepela was never ordered removed from the case, nor did he withdraw his appearance as counsel.

On April 12, 1984, Norfolk, Nebraska, police officers received a call from petitioner's wife, Wanda Hunt, stating that her husband thought he had killed someone. Mo. Hr'g Tr.

3

at 34-36.  Four officers responded to the call.  *Id.* at 4.  At Hunt's house, the officers found Robert Hunt sobbing and rocking in place on the floor in his living room.  *Id.* at 38; Trial Tr. at 51, 324.  Officer Douglas Drekker approached Hunt, with whom he was acquainted, and asked, "Bob, do you remember me?"  *Id.* at 39.  Hunt replied, "Yeah, Doug, I killed her." *Id.* at 39.  The officers did not provide Hunt any *Miranda* warnings at that time.  *Id.* at 53. Two of the officers then left Hunt's residence to check on the reported victim.  *Id.* at 46. While the officers and Hunt awaited word on the victim, Hunt pointed to the couch and volunteered that there was a cassette-tape box with some Playboy magazines and "stuff" inside. Mo. Hr'g Tr. at 43; Trial Tr. at 264, 297.  Officer Rick Brahmer retrieved the box from under the sofa.  Mo. Hr'g Tr. at 43-44.  It contained a BB gun, women's underwear, a pair of women's eyeglasses, and pornographic materials.  *Id.*  Hunt made several incriminating statements to the officers on the scene.  Trial Tr. at 264, 304, 311, 324.

Shortly thereafter, the other officers called to report that a woman had indeed been murdered at the address provided by Hunt.  Trial Tr. at 270, 303.  Hunt was immediately arrested and taken to the police station, but was not *Mirandized* until after he had been booked and processed, more than an hour and a half later.  *Id.* at 303.  The items found under the couch were seized as evidence.  *Id.* at 297-98; Trial Exhibits ("T. Exs.") 21-42. Richard Krepela, the Madison County Attorney, who also functioned as the county's coroner, was present at the victim's home during the investigation of the crime scene.  *Id.* at 337.

Hunt was placed in an interview room with Norfolk Police Captain Leon Chapman. *Id.* at 142, 270.  Captain Chapman had reported to the crime scene and had conferred with Krepela before interrogating Hunt.  *Id.* at 337-39.  During the post-*Miranda* interview, Hunt

4

asked Chapman "how the girl was," and Chapman told Hunt she was dead.  Mo. Hr'g Tr. at 139.  Hunt also stated that he had once told his wife that he had fantasies of killing a woman and having sex with her.  *Id.* at 352.  In response to a query about his intentions, Hunt stated that he had intended to render the victim unconscious and have sex with her.  Trial Tr. at 376.  Hunt denied any intent to kill her.  *Id.* at 384.

After more than an hour of questioning, Captain Chapman asked Hunt for a recorded statement or interview.  *Id.* at 168.  Hunt declined to provide a written statement without an attorney present and stated that he wanted an attorney.  *Id.* at 144-146.  Captain Chapman noted the request in his report, but continued to talk to Hunt, and obtained consent to search Hunt's vehicle.  *Id.* at 145.  The interview was concluded at 1:53 a.m. on April 13, 1984.  *Id.*  Police then searched Hunt's vehicle and home.  *Id.* at 361.

The following morning, after conferring with other officers and with Krepela, Captain Chapman again spoke to Hunt.  *Id.* at 159-62.  Chapman conferred with Krepela before and during the interview.  *Id.* at 180-81; Pretrial Motion Hearing Exhibit ("Mo. Hr'g Ex.") 15 at 11, 13.  In his report, Chapman noted that his purpose in renewing the interrogation was to elicit evidence of premeditation.  *Id.*, Mo. Hr'g Ex. 15 at 17.  Captain Chapman again provided Hunt with *Miranda* warnings at the inception of the interview.  *Id.* at 162.  During the second interview, after an extended period of questioning, Hunt stated that the "general idea" when he went to the victim's house was to kill her.  *Id.* at 165.  At the close of the interview, Hunt again asked for an attorney.  *Id.* at 173-74.  Captain Chapman again noted the request.  *Id.* at 165-66.

As was the usual practice in Madison County at that time, Hunt had waived preliminary hearing in exchange for the production of the police reports to defense counsel.

*Id.* at 133.  Before the trial,  Hunt's attorney moved to suppress the statements Hunt had made to law enforcement officers and the evidence obtained in the searches of Hunt's vehicle and residence.  *Id.* at 1-3.  Hunt asserted that the statements he made before his arrest, the statements he made to Captain Chapman in the two interviews, and his consent to search were not voluntary.  *Id.* at 3.

As discussed more fully later in this opinion, evidence later developed in Hunt's postconviction proceeding in 1997 revealed that the prosecutor, Richard Krepela, had altered Captain Chapman's police report before producing it to the defense.  *See* Filing No. 16, State Court Record, Case No. 97-1142, Bill of Exceptions, Vols. I & II, Postconviction Hearing Transcript ("Postconv. Hr'g Tr.") at 18, 154-55.  Krepela removed the pages of the report that noted that Hunt had asked for an attorney in the first interview and also deleted the information that Captain Chapman's purpose in conducting the second interview was to elicit evidence of intent.  *Id.* at 18; Postconv. Hr'g Exhibits ("Postconv. Hr'g Exs.") 95 and 100.   Krepela substituted a false page, retyped and renumbered, that omitted the references.  Postconv. Hr'g Tr. at 18.  Sometime shortly before the suppression hearing, Krepela asked Captain Chapman to alter the original report to conform to the altered report Krepela had produced to defense counsel, but Captain Chapman refused to do so.  *Id.* at 102.

The day before the suppression hearing was scheduled, Krepela contacted James Smith, a former deputy Madison County Attorney, and asked Smith to take over the prosecution.  *Id.* at 156.  The following day, Smith, defense counsel Thomas Delay, and Krepela met with Judge Richard Garden in chambers.  *Id.* at 276-80; Filing No. 150,

6

Deposition of Richard P. Garden ("Garden Dep.") at 23.  The meeting was off the record and was not transcribed.  Postconv. Hr'g Tr. at 17.  The defendant was not present.

Judge Garden continued the suppression hearing and appointed James Smith as Special Prosecutor.  *Id.* at 16, 22-23.  In a pleading filed shortly thereafter, Krepela moved for appointment of a special prosecutor "to assist the State in the prosecution of this matter."  Postconv. Hr'g Ex. 107.   No reason is stated in the motion.  *Id.*  Krepela was never formally removed from the case.

At the rescheduled suppression hearing several weeks later, a copy of Captain Chapman's original, unaltered report was received into evidence, together with the affidavit of defense counsel Thomas DeLay that stated:

> Pursuant to a stipulation in open court in the County Court of Madison County in the above captioned cause, the prosecuting attorney for the state of Nebraska in this cause stipulated and agreed to deliver to defendant's attorney, Thomas H. DeLay, all police reports, and other evidence obtained by agents of the State of Nebraska in this matter . . . and pursuant thereto, <u>some but not all</u>, police reports were delivered to Defendant's attorney, and that attached hereto and made a part hereof are copies of the police reports pertaining to an in custody interrogation of the defendant by Officer Chapman of the Norfolk Police Department, <u>which report was represented to be the exact statements of the Defendant to Officer Chapman</u> during said interrogations. . . .

*See* T. Tr., Envelope I - Exhibits, Ex. 14 (emphasis added).  Defense counsel submitted a similar affidavit in support of police reports written by other officers that omitted the phrase, "some but not all" and the reference to the report having been represented as the exact words of the defendant to the officer (underlined above).  *Id.,* Ex. 12.  No evidence that any prosecutor had earlier produced an altered or falsified report to the defense was presented.  There was no reference to the altered document in any testimony by the officers.

7

Judge Garden overruled the motion to suppress all of the statements at issue, with the exception of a postarrest statement identifying a washcloth.[1]  Filing No. 16, State Court Record, Case No. 84-797, Nebraska Supreme Court Clerk's Record at 14 (Madison County District Court Order dated July 3, 1984).   The court found that the defendant was not required to have been advised of his *Miranda* rights prior to the time he was handcuffed and placed under arrest at his home, because he was "not yet in custody."  *Id.* at 15.  The court further found Hunt had freely and voluntarily waived his *Miranda* rights with respect to the statements made in both the first and second interviews.  *Id.*  Judge Garden also overruled Hunt's motion to suppress the physical evidence seized in the search of his car and home, finding Hunt's consent voluntary.  *Id.*  No request for an attorney is mentioned in the court's order.

The case was tried in August 1984.  At trial, several Norfolk police officers testified to the incriminating statements Hunt made at his home before he was arrested.  Trial Tr. at 264, 267, 302, 311, 324.  All of the officers used their police reports to refresh their recollections of the incident.  *Id.* at 304, 320, 350.  The prosecutor twice alluded, without objection, to the fact that the police reports had been made available to the defense long before the trial.  *Id.* at 384, 543.  Captain Chapman testified to statements Hunt made in the interview on the night he was arrested, but not to the conversation that had occurred the following morning.[2]  *Id.* at 335-87.  On cross-examination, Chapman testified, as noted in his police report, that Hunt stated that his intent was only to render the victim

---

[1]The prosecution stipulated to the suppression of that statement.  Mo. Hr'g Tr. at 54.

[2]Despite the fact that the trial court had not suppressed this evidence, the prosecution elected not to elicit testimony about the second interview.

8

unconscious for sex, and not to kill her.  *Id.* at 376, 384.  No insanity defense was presented, nor was any psychiatric evidence of Hunt's mental state at the time he committed the crime adduced.

Defense counsel admitted, in both opening statement and in closing argument, to the elements of second-degree murder.  *Id.* at 232, 524.  He argued that the crucial determination for the jury was whether Hunt planned to render the victim unconscious and to have sex with her or to kill her and have sex with her.  *Id.* at 526.  In his closing argument, Hunt's trial counsel argued:

> May it please the court, ladies and gentlemen of the jury:  This is a tough case.  This is tough.  We have got a beautiful young girl who is dead.  We have a defendant, Robert Hunt, who killed her.  He murdered Beverly Ramspott on April 12, 1984, and he did so in Madison County.  Those are some of the elements in both first and second degree murder.  He is a creepy, slimy, sexual degenerate.  I don't think there is anyone in the courtroom who could call him anything else.  He took the life of a beautiful young girl who died during the administration of events for his own sexual gratification.  He's a creep.  If you put ooze on the door, he would ooze into the door.

*Id.* at 523; *State v. Hunt,* 580 N.W.2d 110 (Neb. 1998) (hereinafter, "*Hunt II*").

The jury was instructed on the elements of first-degree murder, second-degree murder and manslaughter.[3]  *Id.* at 547-53.  The jury returned a verdict of guilty to the

---

[3]The jury was instructed:

> A person commits murder in the first degree if he kills another person purposely and with deliberate and premeditated malice.
> A person commits murder in the second degree if he causes the death of a person intentionally but without premeditation.
> A person commits manslaughter if he kills another without malice, either upon a sudden quarrel or causes the death of a person unintentionally while in the commission of an unlawful act.

Filing No. 16, State Court Record, Case No. 84-797, Supreme Court Clerk's Record, Jury Instruction No. 7.

charge of murder in the first degree. *Id.* at 561. A three-judge sentencing panel was later convened to determine Hunt's sentence. *Id.* at 667-95. Prior to sentencing, Hunt was examined by two psychiatrists to determine if Hunt was a mentally disordered sex offender under Nebraska law. *Id.* at 564-94. The psychiatric evidence adduced at the mentally-disordered sex-offender hearing was considered in Hunt's sentencing. *Id.* at 565-665.

## 2. Direct Appeal

Hunt was represented by his trial counsel, Thomas DeLay, on direct appeal. On appeal, Hunt asserted error in the trial court's denial of his motion to suppress and his motion to dismiss. Filing No. 16, State Court Record, Appeal Brief of Defendant-Appellant ("Appeal Brief") at 4; *Hunt I*, 371 N.W.2d at 715. Further, he argued that he had been subjected to an illegal seizure and contended that there was not sufficient evidence of premeditation to convict him of first-degree murder. *Hunt I,* 371 N.W.2d at 715, Appeal Brief at 4, 6. Hunt also challenged the abolition of spousal privilege in Nebraska and challenged the imposition of the death penalty. *Hunt I,* 371 N.W.2d at 715, Appeal Brief at 6-10.

The Nebraska Supreme Court upheld Hunt's conviction but vacated the imposition of the death penalty. *Hunt I,* 371 N.W.2d at 720-21. With respect to the uncounselled statement Hunt made to Captain Chapman in the second interview, the Nebraska Supreme Court stated:

> At trial the prosecutor wisely refrained from introducing into evidence any of the admissions defendant made during the constitutionally suspect second interview. Thus, the trial court's ruling refusing to suppress those admissions had no effect on the resolution of the issue of defendant's guilt. If there was error in the ruling, the error did not result in prejudice and was therefore harmless. Harmless error provides no ground for the reversal of a judgment of guilt.

10

*Id.* at 716. The Supreme Court similarly found no error in the admission of evidence seized from Hunt's car, stating that the evidence was cumulative. *Id.* at 719. It also rejected Hunt's other claims of trial and constitutional error, but found that the crime did not involve the aggravating factors necessary for imposition of the death penalty. *Id.* at 721.

### 3. State Postconviction Proceedings

Hunt pursued an action for postconviction relief in Madison County District Court in 1996.[4] In his amended petition for postconviction relief, Hunt alleged, among other things, that:

> 12. Petitioner was denied due process, a fair trial, and the effective assistance of counsel, in violation of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution, by the original prosecutor, Richard Krepela, falsifying a crucial police report (of Captain Chapman) and delivering the same to trial counsel (Thomas DeLay) with the obvious intention of perpetrating a fraud upon the petitioner and DeLay and eventually upon the trial court (Judge Richard Garden) and the jury; . . .

> 14. Petitioner was denied due process, a fair trial, and the effective assistance of counsel, in violation of his rights under the Sixth, and Fourteenth Amendments to the U.S. Constitution, by his trial counsel (Thomas DeLay) failing to move to disqualify the original prosecutor (Richard Krepela); failing to report Krepela to the Nebraska State Bar Association; failing to insist on an independent investigation by the Bar association or anyone to ascertain the extent of Krepela's illegal activities on this case, in order to determine what harm, if any, had been perpetrated upon petitioner by Krepela in his role as active leader of and advisor in the investigation of petitioner's case; failing to preserve this issue for appellate review by insisting that a court record be made; failing to call Krepela as a witness during the hearing on petitioner's motion to suppress when his testimony would have affected the credibility of the state's case and possibly changed the judge's ruling, based as it was on the comparative credibility of petitioner and captain Chapman; proceeding to trial while Krepela had still not legally withdrawn from the case in a situation of obvious conflict of interest; failing to call Krepela as a witness during jury trial in the case when his testimony

---

[4]Under Neb. Rev. Stat. § 29-3001 (1995), there is no time limit for the filing of a postconviction relief motion.

would have affected the credibility of the state's investigation and of Captain Chapman, and might have affected the outcome of the case; and by failing to properly preserve and raise these issues on appeal;

      15.  Petitioner was denied due process, a fair trial, and the effective assistance of counsel, in violation of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution, by the failure of the prosecutor (James Smith) to ensure the proper disqualification of Richard Krepela, thereby not fully disassociating himself from Krepela and proceeding to trial and sentencing in a situation of actual or apparent conflict of interest between the interest of Krepela and his (James Smith's) duty to conduct a fair trial and seek justice for petitioner.

Filing No. 16, State Court Record, Nebraska Supreme Court Clerk's Record, Case No. S-97-1142, Amended Petition for Postconviction Relief at 4-6; Filing No. 12, Petitioner's Index of Evidence, Ex. K.

The Madison County Public Defender, Harry Moore, was appointed to represent Hunt in the postconviction proceeding.  Postconv. Hr'g Tr. at 1-3.  Madison County Prosecutor Joseph Smith (no relation to special prosecutor Jim Smith) appeared on behalf of the State of Nebraska.  *Id.*  The original trial judge, Richard Garden, presided over the postconviction proceedings.  *Id.*  In the intervening time between the trial and the postconviction action, the original prosecutor, Richard Krepela, had been appointed to the Madison County bench.  *See In re Krepela,* 628 N.W.2d 262, 265 (Neb. 2001).

Early in the postconviction action, Hunt's counsel moved to disqualify Joseph Smith as counsel for the State.  *Id.* at 24.  He argued that Joseph Smith had a conflict of interest because he had worked in the Madison County Attorney's office at the time of Hunt's trial. *Id.*  Also, Joseph Smith had been hired by Krepela in 1984 when Krepela was Madison County Attorney. *Id.*  Other conflicts were created by the personal relationship between Judge Krepela and Joseph Smith, who had worked together and were friends, and by the

12

fact that Smith would practice in front of Judge Krepela in the future.  *Id.* at 47-49.  Hunt's counsel also argued that it was anticipated that Judge Krepela would be called to testify. *Id.* at 6, 24.

In addition, he informed the court that he was considering a motion to recuse the judge.  *Id.* at 8-9, 63-64, 70.  Judge Garden responded:

> I was going to say and I will make the statement for the record now, I have no independent recollection of Mr. Krepela ever telling me that he had substituted pages, or withheld pages of any report.  I would, secondly, state that under the evidence code, I am incompetent to testify as a witness in this case, because this is the same case that I presided as a trial judge.

*Id.* at 64.  Judge Garden denied Hunt's motion to disqualify Joseph Smith in the following colloquy:

> THE COURT:  I think the defense has, in this case, failed to show that there is any actual conflict of interest, has failed to show there is any potential conflict of interest, and has failed to show any appearance of conflict.  There just isn't any conflict shown.
>
> As far as the alteration of the police report and so forth is concerned, from Mr. Smith's brief, it appears that the Nebraska Supreme Court upheld this court's motion to suppress.
>
> MR. MOORE:  Judge, if I may, this [sic] wasn't any evidence in the case. I know that's what his argument is, but I'm not sure it's evidence in this hearing.
>
> THE COURT:  I know, but it's in the book.
>
> MR. MOORE:  If you look at his brief, there's a lot more to it.
>
> THE COURT: But at any rate, that appears to be an issue that was covered by the direct appeal.

*Id.* at 59-60.

The Madison County District Court conducted an evidentiary hearing on Hunt's postconviction action on September 30, 1997- October 1, 1997.  *See* Postconv. Hr'g Tr.,

13

Vols. I & II.  Thomas DeLay, Richard Krepela, James Smith, Captain Leon Chapman, and Officers Timothy Schmitz and David Hatcliff testified at the hearing.  *Id.*  Both the unaltered police report and the altered report that had first been provided to defense counsel were admitted in evidence.  *Id.* at 94, 165, Postconv. Hr'g Exs. 95 & 100.  Comparison of the two reports shows that pages 17 and 18 of the original report were removed and were replaced with a retyped and renumbered page 17.  *Id.* at 98; Postconv. Hr'g Exs. 95 & 100.  Roughly a full page of text from the original document was omitted from the doctored report.  *Id.*  The information that was removed from the original report related that Chapman's purpose in conducting a further interview of Hunt had been to elicit a statement of Hunt's intent to kill the victim.  *See* Postconv. Hr'g Ex. 100 at 17-18; Postconv. Hr'g Ex. 95 at 17.  The altered report also omitted Hunt's statement that "I think you and I had agreed that before I made further statements I have an attorney."  *Id.*

At the postconviction hearing, Richard Krepela testified that he made the alterations in the document.  Postconv. Hr'g Tr. at 133.  He first stated that he did not know why.  *Id.*  He then testified that he had become too personally and emotionally involved in the prosecution of Hunt's case.  *Id.* at 155.  He admitted that his alterations could have created a different impression in the report and could have kept vital information, Hunt's request for a lawyer, from Hunt's counsel.  *Id.*  Krepela explained that "the case just got to [him] . . . [b]ecause the woman died a horrible, lonely death."  *Id.*  He also stated that he knew the family of the victim's fiancé.  *Id.* at 156.  He admitted that he had "lost all perspective" in the case and was not objective.  *Id.*

Krepela characterized his actions as "withholding information," stating "well, I withheld information by changing the report, yes."  *Id.* at 154.  Krepela also testified that

14

he did not think he had "told [Chapman] that [he] changed the report.  I think I said I withheld some information."  *Id.* at 153.  Krepela testified that he told the court he had not complied with the agreement to turn over the reports but did not tell the court that he altered a report.  *Id.* at 156-57.  He further testified that he "apologized to [DeLay] for withholding information from the reports."  *Id.* at 154.  Krepela denied that he asked Chapman to change the original report.  *Id.* at 153.  He also testified that he told Jim Smith to try the case and to win the case, "that was the important thing."  *Id.* at 165.  The record shows that Krepela was listed as a potential witness in Hunt's case and appeared as counsel at Hunt's mentally disordered sex offender hearing and at Hunt's sentencing.  *See* Trial Tr. at 564; Postconv. Hr'g Ex. 105.

Thomas DeLay testified that he did not report Krepela's conduct to the Bar Association because "[h]e was a young fellow, just starting out in the practice of law.  And I just didn't report it.  That's why."  Postconv. Hr'g Tr. at 280.  He testified that the matter had been reported to Judge Garden by either Smith or Krepela at the meeting in chambers.  *Id.*  DeLay also testified that he had not called Krepela to testify at the trial, either to discredit or embarrass him, because DeLay "just [didn't] think that was proper.  I like our profession, and I think it's an honorable profession.  I just don't think it's proper."  *Id.* at 299.  He also thought that Krepela's testimony would only serve to bolster Chapman's credibility.  *Id.* at 291.  DeLay also testified that, because the other officers corroborated each other's testimony on Hunt's prearrest statements, he saw no need to investigate other potential misconduct.  *Id.* at 262.

James Smith, the appointed special prosecutor at Hunt's trial, testified that Richard Krepela called him on June 7, 1984, asking Smith to take over the case.  *Id.* at 340.

15

Krepela told Smith he had altered the report.  *Id.* at 357.  Smith testified that, at the time, he concluded that Krepela had changed the report to strengthen the case for premeditation:

> [B]y being able to introduce the second confession, which was a confession to premeditation by the defendant.  And it made the issue of the defendant's request for an attorney, as I recall, it was changed so that it would not be apparent that the defendant had even made any type of request for an attorney, ambiguous or otherwise, prior to him making that second confession to premeditation.

*Id.* at 358-59.  Smith also testified that he had not conducted any investigation to try to determine "anything else that Krepela would have done as far as misconduct."  *Id.* at 354.

A purported transcript of a recorded conversation between Hunt and defense counsel DeLay on June 8, 1984, was also admitted at the postconviction hearing.[5]  *See* Postconv. Ex. 102.  According to the transcript, DeLay told Hunt:

> the county attorney in our case has a little problem with his own ego and with his own ethics. . . .  I still have not received the remainder of the reports but I found out this morning through the County Attorney's own disclosure the police reports I received had been, were inaccurate reports and were actually fabrications of the actual reports which were submitted by the police to the County Attorney . . . he changed those reports . . . to hide evidence that was in our favor.

*Id.* at 5.  DeLay then explained, "[Krepela] asked the court to appoint someone else to prosecute because he didn't feel like he could prosecute after he committed an act like that and because he would be subject to be called as a witness to explain those items. . . ."  *Id.*  DeLay added that "we could really make an ass of the county attorney if we wanted to in this case."  *Id.* at 10.  DeLay also intimated in the conversation that more evidence might have been fabricated.  *Id.* at 11.  DeLay anticipated that the information could be used to

---

[5]DeLay disputed the accuracy and/or veracity of the transcript.  *See* Postconv. Hr'g Tr. at 233-34.

16

negotiate a plea bargain since "it put them in kind of a bad position." *Id.* at 10. Hunt later obtained copies of the original and altered reports from DeLay, but the record is not clear with respect to when that occurred. Postconv. Hr'g Tr. at 175.

Officer Timothy Schmitz testified that at or around the time of trial, Captain Chapman had inquired if anyone had asked Schmitz to alter a report and he answered, "No." Postconv. Hr'g Tr. at 176-77. Schmitz testified that he inquired as to the reason for the question and was told "it would probably be better if [you] didn't know." *Id.* at 177. Schmitz testified that he did not recall whether Krepela's name or the altered report had been mentioned. *Id.* Officer David Hatcliff testified that he recalled that during or after the trial he "heard it somewhere that there had been something done with a report." *Id.* at 376.

The record of the postconviction proceeding shows that postconviction counsel consistently and vehemently argued that trial counsel had labored under a conflict of interest in trying to protect Krepela's reputation and that the conflict influenced DeLay's performance and defense strategies during trial.[6] *See, e.g.,* Postconv. Hr'g Tr. at 328-29, 278, 424, & 428. He also argued that the combined inappropriate actions of the prosecution and defense deprived Hunt of a fair trial. *Id.* at 418-22, 426. Postconviction counsel expressly argued that Hunt's trial counsel operated under a conflict of interest. Postconv. Hr'g Tr. at 278, 428. The record shows that Judge Garden was not receptive to that argument.

---

[6]Moore argued that the conflict undermined DeLay's representation of Hunt. *Id.* at 328, 424. He argued that there was a reasonable probability that the court's ruling on the motion to suppress would have been different if the fact of the misconduct had been revealed to the judge. *Id.* at 425. He expressly cited the Supreme Court case of *United States v. Cronic,* 466 U.S. 648 (1984), and a Nebraska decision, *State v. Schneckcloth,* 235 Neb. 853 (1990), for the proposition that the standard the court should apply was "there must have been a conflict of interest of the lawyer and that because of that conflict of interest, he did something to the detriment of the defendant." *Id.* at 424.

17

The court sustained the State's relevance objections to questions about whether Krepela's purpose in altering the document was to conceal Hunt's unequivocal request for an attorney. *Id.* at 140-43, 147. The court stated: "I think the objection is well taken. This has no probative value. This matter has already been to the Supreme Court on the suppression hearing on Exhibit 100." *Id.* at 140. The court also sustained the State's "calls for a legal opinion" objection to a question posed to Krepela on the effect of a defendant's request for counsel during a custodial interrogation, stating:

> THE COURT: The basis is that it's no relevance what the defendant's — what the witness' thinking was at the time this occurred. The fact is, it occurred. And the fact is it was corrected before the suppression hearing. Why is of no relevance. Why this witness did what he did is of no relevance.
>
> This defendant had a fair suppression hearing, was represented by counsel, and that's been reviewed by the Supreme Court.

*Id.* at 143-44. Hunt's counsel sought to elicit testimony with the following question:

> MR. MOORE: Now, if someone hypothetically asks for a lawyer, which seems to be for a limited purpose, and then later says, I thought I was going to have a lawyer, without that limiting purpose, wouldn't that seem to refer back to the original request, or give some light as to what their intention was, even if unspoken?

*Id.* at 145. The court again sustained the State's objection and Hunt's counsel took issue with the ruling, arguing:

> MR. MOORE: . . . I'm trying to reconstruct motive.
>
> Clearly, if I was given the opportunity—this is an offer to prove the fact—this witness would testify . . . that the second statement that Hunt made saying, I thought I was going to have an attorney present, I thought we had agreed, can only refer back to this earlier discussion with Chapman where he said he wanted an attorney for a tape recorded statement or written, handwritten statement. . . . That's . . . the only plausible motive why anybody would take the risk, or go to the extent of deleting that section of this report in order to gain an advantage at the motion to suppress hearing.

18

He also testified he altered no other reports. And later, with the other witnesses, we'll be going into what investigation was done or not done, checking how far this was involved in this case. Being prevented from establishing any of this, under some guise that I'm asking for legal opinions of this person, I'm asking for subjective intent in changing this report back then. . . . I'm asking the court to reconsider its rulings.

*Id.* at 146-47. The court overruled the motion for reconsideration. *Id.* at 147-48.

The Madison County District Court denied Hunt's petition for postconviction relief in all respects. Filing No. 16, State Court Record, Case No. S-97-1142, Supreme Court Clerk's Record at 19-28 (Madison County District Court Order dated Oct. 7, 1997) ("Postconv. Order"); Filing No. 12, Petitioner's Index of Evidence, Ex. K. Applying the analysis set forth in *Strickland v. Washington,* 466 U.S. 668, 693 (1984) to Hunt's claims of ineffective assistance of counsel, the court first found that Hunt had not shown a reasonable probability that the result of the trial would have been different absent his trial counsel's alleged ineffective assistance. Postconv. Order at 4-8. The court similarly found that no prejudice had resulted from Hunt's counsel's conflicts of interest. *Id.* at 10. The court found that "[n]either the trial nor any pretrial motion was affected by the altered report," and Krepela's actions in falsifying the document had not prejudiced the defendant. *Id.* at 9. The court further found no evidence that any other police reports were altered. *Id.*

On Hunt's behalf, Moore appealed Judge Garden's postconviction ruling to the Nebraska Supreme Court. *See Hunt II,* 580 N.W.2d at 110. On appeal, he argued, as he had to the trial court, that the postconviction court should have applied the standard applicable to structural errors set out in *United States v. Cronic,* 466 U.S. 648 (1984),

rather than the *Strickland* standard, to his claims of ineffective assistance of counsel.[7]  *See* Filing No. 16, State Court Record, Case No. S-97-1142, Postconviction Appeal Brief.  He argued that the *Cronic* standard of presumed prejudice should apply because counsel's closing argument—in which trial counsel conceded certain elements of the crime and made derogatory and inflammatory remarks about Hunt—amounted to a "total absence of counsel."  *Hunt II*, 580 N.W.2d at 113.  The record shows that there was substantial disagreement between Hunt and his postconviction counsel regarding the strategy on appeal.  *See* Filing No. 12, Petitioner's Index of Evidence, Ex. L, correspondence between Hunt and Moore.  Hunt wanted Moore to raise the issue of the falsified document issue on appeal.  *Id.*

The Nebraska Supreme Court affirmed the denial of postconviction relief.  *Hunt II*, 580 N.W.2d at 113.  It rejected Hunt's contention that the alleged errors by trial counsel in closing argument amounted to a "failure to subject the prosecution's case to meaningful adversarial testing" that would trigger a presumption of prejudice under *Cronic.  Id.* at 113.  It then found that Hunt had not shown the requisite prejudice under the *Strickland* standard.  *Id.* at 114-15.  The court noted that Hunt's trial counsel had moved to suppress Hunt's statements and had discussed trial strategy with Hunt.  *Id.* at 114.  There is no mention of the falsified document in the Nebraska Supreme Court's opinion.

Hunt filed a federal habeas corpus proceeding and later returned to state court to present additional claims to the Nebraska courts in a second postconviction action.  *See State v. Hunt*, 634 N.W.2d 475 (Neb. 2001) (*"Hunt III").*  In that action, Hunt raised Fifth

---

[7]The *Cronic* standard for evaluation of structural errors does not require any showing of prejudice. *See United States v. Cronic,* 466 U.S. at 659 nn. 25 & 26.

and Sixth Amendment claims that related to the combined conduct of the prosecution, the defense, the trial court, and his postconviction counsel. *Id.* at 478. The second action for postconviction relief was eventually dismissed by the Nebraska Supreme Court. *Id.* at 480. The Nebraska Supreme Court construed the claim as one for ineffective assistance by postconviction counsel and found the claim did not involve a constitutional issue. *Id.* at 479. It found Hunt's claim that "trial counsel's involvement with the trial judge concerning a false police report was prejudicial . . . should have been raised in *Hunt I* [the direct appeal] or *Hunt II* [the first postconviction action]." *Id.* at 478. Hunt sought, but was denied, a hearing in the action.

### 4.   Related Disciplinary Action

In a separate proceeding in 2001, the Nebraska Supreme Court addressed Krepela's conduct in Hunt's case in response to a disciplinary complaint.[8]   *See In Re Krepela,* 628 N.W.2d 262, 265 (Neb. 2001). Krepela had been appointed a Madison County Court Judge in 1989. *Id.* The Nebraska Commission on Judicial Qualifications ("the Commission") investigated the complaint and conducted a hearing at which additional evidence was adduced. *See id.* at 267; Filing No. 148, Minutes of federal habeas corpus proceeding, Ex. 2, Deposition of Leon Chapman ("Chapman Dep.") at 36. Both a Special Master and later the Commission found that clear and convincing evidence established that Krepela had altered a police report and had asked Captain Chapman to do the same. *In re Krepela,* 628 N.W.2d at 268-70.

---

[8]It is not clear in the record whether the investigation was prompted by Hunt's disciplinary complaint, but the record shows that Hunt filed disciplinary complaints with the Nebraska State Bar Association against Krepela, DeLay, James Smith and Richard Garden shortly after the first postconviction proceeding. *See* Filing No. 12, Petitioner's Index of Evid., Ex. N. He later filed a complaint against his postconviction counsel, Harry Moore. *Id.*

The Commission also found that Krepela had admitted "he created a false report," and that "realizing that the false report was likely to be discovered in view of the pending motion to suppress, made arrangements for the appointment of Smith as special prosecutor." *Id.* at 266-68. It found the actions constituted conduct prejudicial to the administration of justice and recommended Krepela's removal from office. *Id.* at 265. It also found that Krepela's conduct violated at least three criminal statutes. *Id.* at 268. Krepela appealed the Commission's factual findings and legal conclusions to the Nebraska Supreme Court.

The Nebraska Supreme Court noted that the misconduct had come to light in Hunt's postconviction proceeding in 1997. *Id.* at 268. It agreed with the Commission's factual finding that Krepela had altered the document and had asked Captain Chapman to do the same. *Id.* at 268. The Supreme Court stated:

> The record shows that Krepela had become personally and emotionally involved in the prosecution of the Hunt case. Krepela testified that he knew the victim's fiancé and the fiancé's family very well. There was also evidence that Hunt had stalked the neighborhood in which Krepela's own fiancée lived. Krepela testified that his personal involvement with the case interfered with his decisionmaking and caused him to make mistakes.

*Id.* at 266. The Supreme Court also discussed Krepela's motivation, noting that:

> Krepela testified that during his conversation with Chapman, he realized that he was too emotionally involved in the case and that his actions were harming the case. Krepela's testimony indicates that he felt it was not a fear of getting caught that made him want to confess, but a realization that his actions would make Chapman appear to be a bad witness and a general feeling that he regretted what he had done.

*Id.* at 267.

The court noted that the Commission had not made "a clear finding of fact regarding the extent to which Judge Garden was informed of what Krepela had done, nor did it

22

conclude by clear and convincing evidence that Judge Garden was not informed of the alteration." *Id.* at 268. Krepela had testified that he could not remember the specifics of presenting the matter to Judge Garden and did not recall whether Judge Garden had been shown the doctored report. *Id.* at 268. "Krepela testified that he could not remember the exact words he used to explain the situation to Judge Garden, but stated that he had no doubt that Judge Garden knew exactly what had happened."[9] *Id.* at 267. The Supreme Court noted, however, that DeLay received the correct report only after the in-chambers meeting with Judge Garden and stated that the Commission "emphasized DeLay's testimony that he did not have a full understanding of what had transpired until he saw and compared the two copies of the police report." *Id.* at 267-68.

The Nebraska Supreme Court found that "Krepela's actions were plainly dishonest, deceitful, and in violation of his duties as a prosecutor." *Id.* at 270-71. It agreed "with the Commission that Krepela's actions constitute conduct prejudicial to the administration of justice that brings the judicial office into disrepute." *Id.* at 270. It also noted that "Krepela's actions were designed to impede discovery of a possible Sixth Amendment violation," and that his actions struck at the very heart of the criminal justice system. *Id.* at 271. Noting his unblemished record in the intervening years, and calling the conduct an aberration, the Nebraska Supreme Court ultimately suspended Krepela without pay, but did not remove him from office. *Id.* at 272. In dissent, Nebraska Supreme Court Justice Michael McCormack noted that "[t]his type of conduct by any lawyer, much less by a county

---

[9]This testimony is at odds with Krepela's testimony at the postconviction hearing that told Judge Garden only that he had breached his agreement and withheld some information, not that he had physically altered a report.

23

attorney prosecuting a first-degree murder case, goes to the very heart of our judicial system because it involves the integrity of the system." *Id.*

### 5.    Federal Habeas Corpus Action

#### a.    Procedural History

Hunt timely filed his petition in this action *pro se* in 1998.  His *pro se* complaint contained a claim for prosecutorial misconduct based on Krepela's alteration of the evidence.  Filing No. 1, Petition.  In the petition, Hunt recited the facts that had come to light in the postconviction proceeding.  *Id.* at 7-8.  In addition to the claims that had first been set out in his state postconviction petition, Hunt added that "how much, and when Judge Garden knew of the altering prior to the September, October 1997 postconviction hearing is unclear." *Id.* at 8.  On initial review, this court determined that some of Hunt's claims had not been presented to the state court and granted Hunt leave to file an amended petition to address whether there was cause to excuse the procedural default. Filing No. 8, Memorandum and Order at 4-5.  Hunt then filed an amended petition.  Filing No. 11, Amended Petition, Filing Nos. 2 & 12, Exhibits.

In the Amended Petition, Hunt alleged that he made a good faith effort to present his claims to state courts, "but was prevented by state court officials and prosecutorial officials actions which in turn greatly influenced the actions or in-actions of state appointed private counsel in petitioner trial and direct appeal and then with state-appointed postconviction counsel in petitioner's postconviction actions."  Filing No. 11, Amended Complaint at 2.  With respect to the purported procedural default, Hunt further alleged that:

> [T]he state court initially attempted to keep this criminal action from the jury . . . [and to] use its influence and intimidation with state appointed Public defender Harry Moore during the course of Mr. Moore's representation of

>petitioner, in that Mr. Moore had several concerns about how he and his office was treated by the District Court through the petitioner's proceedings and how the court would act against the Public Defender's office in the future. . . . Also, during this period of time the District Court filed Nebraska Bar Association charges against petitioner's counsel, Mr. Moore. Mr. Moore due to all the actions of this court removed deliberately the prosecutorial misconduct claim before it went to the Nebraska Supreme Court, severely damaging the petitioner's Due Process and equal protection to have his claims presented in a fair way before the courts. . . . The Judge, the Prosecutor, the trial and Appeal counsel and the post-conviction counsel all had a conflict of interest in one way or the other that was influenced the whole court process of the petitioner with how a very key piece of evidence (Prosecutorial Misconduct-Concerning Petitioner's confessions) were handled.

*Id.* at 2-3. Hunt alleged that defense counsel, the prosecutor, the special prosecutor and the trial judge engaged in off-the-record meetings to avoid presenting key evidence to the jury at trial and to protect the criminal actions of the prosecutor. *Id.* at 4. He further alleged that "petitioner believes the same state court influenced [Hunt's] state appointed public defender to not even address this claim [on postconviction appeal]." *Id.* at 5.

Based on that showing, this court found that Hunt's claims were either exhausted or that Hunt had demonstrated cause and prejudice to overcome any procedural default and ordered the state to answer or respond to Hunt's petition. Filing No. 13, Memorandum and Order dated February 2, 1999. Hunt later elected to return to state court to exhaust certain claims and moved "to set aside" his federal habeas corpus action pending resolution in state court. Filing No. 23. The court appointed an attorney to represent Hunt, and granted leave to file a third amended petition. Filing Nos. 24 and 26. In June 2000, the court granted Hunt's motion for voluntary dismissal "without prejudice to filing a third amended petition that would relate back to the original filing." Filing No. 37. The State appealed the "without prejudice" dismissal to the United States Court of Appeals for the

Eighth Circuit ("the Eighth Circuit").  *See* Filing 38.  The Eighth Circuit dismissed the appeal for lack of a final order.  *Hunt v. Hopkins,* 266 F.3d 934, 937 (8th Cir. 2001).  At the conclusion of his second postconviction action in state court, Hunt returned to this court and filed his Third Amended Petition in this case.  Filing No. 54.

### b.  Evidence

After remand from the Eighth Circuit, this court held evidentiary hearings on Hunt's habeas corpus petition on October 17, 2005, and April 14, 2006.  Thomas DeLay, James D. Smith, Harry Moore and Judge Richard Krepela testified at the hearings and Captain Leon Chapman and Judge Richard Garden submitted testimony by deposition.  DeLay, Smith and Chapman all testified to essentially the same sequence of events as they had in the state postconviction hearing, with several important distinctions.

Captain Chapman testified that Krepela had been outside the interview room during his interrogation of Hunt and Chapman had conferred with Krepela before or during the interview.  Filing No. 148, Minutes of Proceeding, April 14, 2006, Hr'g Ex. 1, deposition of Leon Chapman ("Chapman Dep.") at 13.  He also stated that he had consulted Krepela immediately after Hunt had asked for an attorney in the first interview.  *Id.*

Harry Moore testified that he had been appointed Madison County Public Defender by Judge Garden.  Filing No. 134, Transcript of Evidentiary Hearing, October 17, 2005, ("Fed. Evid. Hr'g Tr.") at 145.  Moore also testified that he became aware that the document had been physically altered only after he was able to perform a side-by-side comparison of the two documents, noting:

> the two reports are identical . . . then one report has the omission of an entire
> page, and then there is a phony page that appends to the last page that is

correct, whereas the true report goes on for a page and a partial page after
that.

*Id.* at 148.  Moore testified that the reason he did not pursue the allegations of misconduct

against "Richard Krepela, James Smith, Judge Garden himself, [and] the Norfolk police"

in the postconviction appeal was that he "couldn't establish anywhere in the record that

anything Krepela had done had affected the trial."  *Id.* at 168.  He further stated that Judge

Garden had written an opinion that was "appeal-proof."  *Id.* at 167.  He stated he was at

a "complete dead end," in part because "Judge Garden himself was insisting in 1997 that

he had no recollection of having been involved in any of this stuff."  *Id.* at 168.

Judge Garden testified that DeLay, Krepela, and Smith came to his chambers on

the morning Hunt's motion to suppress was set for hearing, June 8, 1984, and said they

were not ready to proceed with the suppression hearing.  Filing No. 150, Deposition of

Richard P. Garden ("Garden Dep.") at 12.  Garden testified that he "was told they didn't

turn over all of the police reports."  *Id.* at 13-14, 27.  Judge Garden testified that no one told

him the police reports had actually been altered.  *Id.* at 14.  Judge Garden's best

recollection was that DeLay had told him "they didn't turn over all the police reports," and

that "the first time [he] heard anything about Mr. Krepela altering police reports was on the

motion for postconviction relief that Mr. Hunt brought."  *Id.* at 14, 17-18.  He testified that

neither Krepela, Smith, nor DeLay brought the matter to his attention.  *Id.* at 18.  He also

testified that he recalls that Krepela stated that he wanted help with the prosecution and

wanted Jim Smith appointed to help him.  *Id.* at 15.  He entered the type of order that is

entered when additional counsel is required to help prosecute a case.  *Id.* at 16, 30.  He

did not recall an explanation for Smith's appointment, nor did he recall an apology by Krepela for misconduct. *Id.* at 16.

Judge Garden testified that learning of the misconduct was "like a knife in [his] heart." *Id.* at 19. He noted the important distinction between failing to produce all of the discovery documents and actually altering evidence. *Id.* He further stated that he did not know what he would have done in 1984 if he had been informed of the alteration. *Id.* at 20. He stated that he presumed that he would have had a duty to report the incident to the Bar Association and that other attorneys would have had a similar obligation. *Id.*

Krepela also testified at the evidentiary hearing. He testified that he no longer had an independent recollection of the events, but he essentially confirmed the testimony adduced at the other hearings. He testified that prior to the Hunt case in 1984, he had only tried one murder case. He stated that he was at the scene of the murder with law enforcement officers and later at the police station, so that he could help or confer with the officers regarding their questioning of Hunt.

He also stated that there was no public defender in Madison County in 1984 and defense counsel were appointed by the court. He stated that in serious cases, the court would ordinarily appoint an attorney with enough experience to handle the case. He further stated that Tom DeLay was one of the most difficult lawyers to try a case against.

Krepela also testified that if a defendant were to ask for an attorney during an interrogation, he would have been the person, as county attorney, to inform the court of that fact. He stated that he ordinarily had police reports before charges were filed and that defendants could get the reports if they waived preliminary hearing. He would not advise an officer to talk to defense counsel without a county attorney present.

28

Krepela again admitted that he had altered Captain Chapman's report before turning it over to defense counsel.  He stated that he asked his secretary, who is now deceased, to retype the report.  He further testified that only he, DeLay, Smith, and possibly Chapman were aware at the time that he had altered the report and that Judge Garden was aware of it only in general terms.  He again testified that he had not asked Captain Chapman to alter his report, acknowledging that Chapman remembered the incident differently.

He testified that he called former deputy county attorney Jim Smith and asked Smith to take over the case once he realized how emotionally involved in the case he had become and realized that he was screwing the case up.  He also stated that he had been Jim Smith's boss when he worked at the Madison County Attorney's office and that the two of them had tried cases together.  Krepela testified that Smith had turned the correct reports over to DeLay.  He also testified he told Smith to do whatever he had to do to prosecute the case.

He stated that he believed he informed Judge Garden that he withheld information and he apologized to Judge Garden for failing to follow through with the agreement and for withholding the information.  He did not believe that Judge Garden asked for a reason for appointing a special prosecutor.  Krepela stated that he "supposed" there is a difference between withholding and fabricating evidence, but that he would not characterize his actions as forgery because he didn't sign anything.

### c.  Claims and Defenses

Hunt raises nine claims in his Third Amended Petition for habeas corpus relief, generally alleging that he was deprived of his Fifth and Sixth Amendment rights to Due

29

Process and effective assistance of counsel.[10]  Filing No. 54, Third Amended Petition.  As

its first defense to the petition, the State contends that the petition is a successive federal

habeas corpus proceeding prohibited by 28 U.S.C. § 2254.  Filing No. 63, Answer at 3.

The State concedes that Hunt has exhausted his claim that the admission of his confession

violated his constitutional rights (Claim 1) and his claim that trial counsel was

constitutionally ineffective with respect to comments made during closing argument (Claim

5).  *Id.* at 3, 5.  It asserts that Hunt's other claims have not been exhausted and are

_____

[10]Hunt's claims are specifically set forth as follows:

Claim 1:  The admission of Mr. Hunt's confessions violated Mr. Hunt's rights under the Fifth Amendment, made applicable to the states through the Fourteenth Amendment.

Claim 2:  Mr. Hunt was denied his right to a fair trial and due process under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution when original prosecutor Richard Krepela altered police reports detailing Mr. Hunt's request for an attorney prior to his confession to the crime and then withheld the information from defense attorney Thomas DeLay.

Claim 3:  Mr. Hunt was denied his right to a fair trial and due process under the Fifth, Sixth, and Fourteenth Amendments when an off-the-record meeting between Mr. Krepela, Special Prosecutor James Smith, defense attorney Thomas DeLay, and presiding Judge Richard Garden resulted in a tacit agreement to conceal Mr. Krepela's conduct from Mr. Hunt and to allow Mr. Krepela to remain part of the prosecuting team in Mr. Hunt's case.

Claim 4:  Mr. Hunt was denied his Sixth Amendment right to effective assistance of counsel at trial when his attorney participated in the off-the-record meeting regarding Mr. Krepela's alteration of the police report yet failed to insist on Mr. Krepela's removal from the case, failed to inform Mr. Hunt of Mr. Krepela's misconduct, and failed to investigate the possibility of alterations in other reports.

Claim 5:  Mr. Hunt was denied his Sixth Amendment right to effective assistance of counsel at trial when Mr. DeLay made remarks which inflamed the jury into convicting Mr. Hunt of first-degree murder.

Claim 6:  Mr. Hunt was denied his Sixth Amendment right to effective assistance at trial when his counsel threatened to withdraw if Mr. Hunt insisted on pleading not guilty by reason of insanity.

Claim 7:  Mr. Hunt was denied his Sixth Amendment right to effective assistance of counsel at trial when Mr. DeLay failed to present evidence of Mr. Hunt's insanity at the time of the offense.

Claim 8:  Mr. Hunt was denied his right to effective assistance of counsel at sentencing when Mr. DeLay:  1) allowed Mr. Hunt to be examined by state psychiatrists without counseling Mr. Hunt as to how those statements could be used; and 2) failed to object to the admission of the statements at sentencing.

Claim 9:  The admission at sentencing of Mr. Hunt's unwarned statements to state psychiatrists violated Mr. Hunt's privilege against compelled self-incrimination, guaranteed by the Fifth Amendment and made applicable to the state through the Fourteenth Amendment.  *See* Filing No. 54, Third Amended Petition at 3-7.

procedurally barred and it generally denies any violation of Hunt's constitutional rights. *Id.* at 3-10. Petitioner has submitted a brief in support of his petition. Filing No. 73. Inexplicably, the State has not submitted a brief in response. *See* Filing No. 148, Minutes; Filing Nos. 78, 80, orders granting extensions of time in which to respond.

## II.   DISCUSSION

### A.   Procedural Defenses

The State concedes that Hunt's claims involving the denial of his motion to suppress and ineffective assistance of Hunt's counsel in closing argument have been exhausted and are not procedurally barred. The State first contends that Hunt's petition is subject to dismissal as successive. Conflating the issues of exhaustion and procedural bar, the State next asserts that Hunt's remaining claims have not been exhausted and are also procedurally barred. Those remaining claims are: (1) claims that involve the prosecutor's alteration of evidence; (2) ineffective assistance of counsel claims that involve alleged instances other than closing argument; and (3) a claim involving the consideration of Hunt's psychiatric reports in connection with his sentencing. All of the claims allege violations of either Hunt's right to due process under the Fifth Amendment or his right to effective assistance of counsel under the Sixth Amendment.

#### 1.   Law

##### a.   Successive Petition

Under the gatekeeping provisions of 28 U.S.C. § 2244(b)(2), "[a] claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed" except under certain, narrow circumstances. *See id.,* §§ 2244(b)(2)(A)-(B). The phrase "second or successive" is not self-defining. *Panetti v. Quarterman,* — U.S. —, —, 127 S. Ct. 2842, 2853 (2007). It takes

its full meaning from Supreme Court caselaw, including decisions predating the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Id.*

Petitioners with "mixed petitions"—those with exhausted and unexhausted claims—have two options. *Rose v. Lundy,* 455 U.S. 509, 520-522 (1982) (plurality opinion). "They may withdraw a mixed petition, exhaust the remaining claims, and return to district court with a fully exhausted petition" or "may proceed with only the exhausted claims, but doing so risks subjecting later petitions that raise new claims to rigorous procedural obstacles." *Burton v. Stewart,* — U.S. —, —, 127 S. Ct. 793, (2007); *see also Slack v. McDaniel,* 529 U.S. 473, 486-487 (2000). A district court faced with a petition that contains both exhausted and unexhausted claims has discretion to enter a stay to allow the petitioner to present his unexhausted claims to the state court in the first instance, preserving the petitioner's ability to return to federal court for review of his perfected petition. *See Rhines v. Weber,* 544 U.S. 269, 276 (2005); *see also Panetti,* — U.S. —, —, 127 S. Ct. at 2854 (rejecting "empty formalities" in interpretation of exhaustion and successive petition provisions in AEDPA); *Akins v. Kenney,* 410 F.3d 451 (8th Cir. 2005).

A stay and abeyance is appropriate "when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Rhines,* 544 U.S. at 276-78 (noting that it should not be granted if a petitioner's claims are plainly meritless or if the petitioner engages in abusive litigation tactics or intentional delay). On the other hand, "[i]t likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id.* In such a case, "the

petitioner's interest in obtaining federal review of his claims outweighs the competing interests in finality and speedy resolution of federal petitions." *Id.*

A prisoner whose habeas petition is dismissed for failure to exhaust state remedies, and who then exhausts those remedies and returns to federal court, does not by such action file a successive petition. *Stewart v. Martinez-Villareal,* 523 U.S. 637, 644 (1998). Moreover, an amended habeas corpus petition relates back to the original "so long as the original and amended petition state claims that are tied to a common core of operative facts." *Mayle v. Felix,* 545 U.S. 644, 664 (2005).

### b.    Exhaustion

A state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus. *Picard v. Connor,* 404 U.S. 270, 275 (1971). The exhaustion-of-state-remedies doctrine is now codified in the federal habeas statute. *Id.*; 28 U.S.C. § 2254 (b)(1). The doctrine reflects a policy of federal-state comity, "an accommodation of our federal system designed to give the State an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Picard,* 404 U.S. at 275 (*quoting Wilwording v. Swenson,* 404 U.S. 249, 250 (1971) (per curiam)). Once the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied. *Id.* (stating that "[o]nly if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies"). The AEDPA "requires only that state prisoners give state courts a fair opportunity to act on their claims." *O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999).

"The question of exhaustion 'refers only to remedies still available at the time of the federal petition,' it requires federal courts to ask whether an applicant for federal relief could still get the relief he seeks in the state system."  *O'Sullivan,* 526 U.S. at 850 (Stevens, J., dissenting) (*quoting Engle v. Isaac,* 456 U.S. 107, 125-26 n.28 (1982)); *see also O'Sullivan*, 526 U.S. at 848 (majority opinion) (noting agreement with the dissent's description of the law of exhaustion and procedural default).  If the applicant currently has a state avenue available for raising his claims, a federal court, in the interest of comity, must generally abstain from intervening.  *Id.* at 850.  "State-court remedies are described as having been 'exhausted' when they are no longer available, regardless of the reason for their unavailability," including a petitioner's failure "to comply with the deadline for seeking state-court review or for taking an appeal" that would impose a procedural bar.  *Woodford v. Ngo,* 548 U.S. 81, —, 126 S. Ct. 2378, 2387 (2006); *see also Gray v. Netherland,* 518 U.S. 152, 162-63 (1996).

State petitioners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the state's established appellate review process.  *O'Sullivan,* 526 U.S. at 845.  Also, the petitioner  must "fairly present" the "substance" of his federal habeas corpus claim to the state courts.  *Anderson v. Harless,* 459 U.S. 4, 6 (1982).  In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts.  *Carney v. Fabian,* 487 F.3d 1094, 1096 (8th Cir. 2007) (noting that state courts must be alerted to the fact that petitioners are asserting claims under the United States Constitution).

Exhaustion, however, is not required in those instances where "there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any claim to obtain relief." *Duckworth v. Serrano,* 454 U.S. 1, 3 (1981); *O'Sullivan,* 526 U.S. at 847 ("[N]othing in our decision today requires the exhaustion of any specific state remedy when a State has provided that remedy is unavailable."). "The [Supreme] Court has frequently recognized that the policy underlying the exhaustion-of-remedies doctrine does not require the exhaustion of inadequate remedies." *See Boumedienne v. Bush*, — U.S. —, 127 S. Ct. 1478 (April 2, 2007) (quotation omitted) (Mem.) (Stevens and Kennedy, JJ., dissenting from denial of cert.), *reh'g granted, vacated, cert. granted,* — U.S. —, 127 S. Ct. 3078 (June 29, 2007) (Mem.).

### c.   Procedural Default

### i.   Adequate and Independent State Ground

The procedural bar doctrine, sometimes known as procedural default, is a corollary to the habeas statute's exhaustion requirement. *See Dretke v. Haley,* 541 U.S. 386, 388 (2004) (stating that the concepts of exhaustion and procedural bar are related, but distinct, concepts). The procedural default doctrine is a separate waiver doctrine, crafted to protect the integrity of the exhaustion provision. *See O'Sullivan,* 526 U.S. at 853 (Stevens, J., dissenting); 848 (majority opinion); *Engle v. Isaac,* 456 U.S. at 125-26 n.28 (1982). Out of respect for the finality of state court judgments, federal habeas courts, as a general rule, are closed to claims that state courts would consider defaulted. *House v. Bell,* 126 S. Ct. 2064, 2068 (2006). However, the procedural default doctrine provides only a strong prudential reason not to address a defaulted constitutional claim that is presented for federal habeas review. *Dretke*, 541 U.S. at 392-93. "Federal courts always have the

equitable power to look beyond a state procedural bar and proceed to the merits of a habeas corpus petition." *Easter v. Endell,* 37 F.3d 1343, 1345 (8th Cir. 1994).

A procedural bar will apply only if the state court decision rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment. *Lee v. Kemna,* 534 U.S. 362, 376 (2002). A failure to comply with the state's procedural rules can furnish an independent and adequate state ground of decision that will block federal collateral review.[11]  *See Harris v. Reed,* 489 U.S. 255, 262 (1989); *Coleman v. Thompson,* 501 U.S. 722, 729-30 (1991).

A state procedural rule is "independent" if it is not linked to or dependent on federal law. *Easter v. Endell,* 37 F.3d at 1345. A state procedural ruling is adequate only if it is firmly established and regularly followed. *Lee,* 534 U.S. at 376 ("[t]o be adequate, a state's procedural rule must be proclaimed in advance and regularly followed"); *Ford v. Georgia,* 498 U.S. 411, 424 (1991) (noting that a court will decline to apply a procedural rule when a defendant could not be deemed to know of its existence). "'[T]he adequacy of state procedural bars to the assertion of federal questions,' is not within the State's prerogative finally to decide; rather, adequacy 'is itself a federal question.'" *Lee,* 534 U.S. at 375 (*quoting Douglas v. Alabama,* 380 U.S. 415, 422 (1965)).

However, even if a state procedural rule is adequate and independent, there are cases "in which the exorbitant application of a generally sound rule renders the state

---

[11]Several state procedural rules have been invoked to bar the presentation of petitioner's claims. Under Nebraska law, a motion for postconviction relief cannot be used to secure review of issues which were known to the defendant and which were or could have been litigated on direct appeal. *State v. Moore,* 718 N.W.2d 537, 542 (2006). Because of the need for finality in the criminal process, a defendant must bring all claims for relief at the first opportunity. *State v. Ryan,* 601 N.W.2d 473, 484 (Neb. 1999). Also, the Nebraska Postconviction Act specifically provides that a "court need not entertain a second motion or successive motions for similar relief on behalf of the same prisoner." Neb. Rev. Stat. § 29-3001; *State v. Marshall,* 725 N.W.2d 834, 838 (Neb. 2007).

ground inadequate to stop consideration of a federal question." *Id.* at 376 (finding the ordinarily "unassailable" contemporaneous-objection rule was inadequate to bar consideration of a defendant's due process claim in a case involving an "unusual sequence of events" that included the State's belated reliance on the rule and a lack of caselaw that required "flawless compliance" with the rule). Accordingly, a procedural default can be excused where the factual predicate of the claim has been presented to a postconviction court and the petitioner has made an effort to bring it to the attention of appropriate state courts. *Clemmons v. Delo,* 124 F.3d 944, 946 n.1, 947-50 (8th Cir. 1997) (involving a situation where a petitioner's postconviction counsel, contrary to the instructions of the petitioner, abandoned an issue involving nondisclosure of exculpatory evidence on appeal of a state court postconviction order). When a petitioner does "the only thing he could do: he trie[s] to bring the issue to the attention of the [state] Supreme court himself," a claim will not be considered defaulted. *Id. a*t 948.

### ii.    Cause and Prejudice

Even if a state court's refusal to reach the merits of a petitioner's claim is premised on an "adequate and independent" state law ground, courts recognize an equitable exception to the procedural bar when a habeas corpus applicant can demonstrate cause and prejudice for the procedural default. *Dretke,* 541 U.S. at 393 (noting that "the cause and prejudice requirement shows due regard for States' finality and comity interests while ensuring that fundamental fairness remains the central concern of the writ of habeas corpus"). To show cause excusing procedural default, a petitioner must show that some "objective factor external to the defense" impeded his efforts to raise the claim in state court. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *McClesky v. Zant,* 499 U.S. 467, 497

(1991) (stating that for cause to exist, the external impediment, whether government interference or the reasonable unavailability of the factual basis for the claim, must have prevented the petitioner from raising the claim).

A prison mail system's failure to deliver a pleading is an example of external interference that amounts to cause. *Ivy v. Caspari,* 173 F.3d 1136, 1141 (8th Cir. 1999). The unavailability of a legal claim is also cause to excuse a procedural default. *Coleman,* 501 U.S. at 753; *Reed v. Ross,* 468 U.S. 1, 14-15 (1984) (holding that the novelty of a claim is cause to excuse counsel's failure to raise a claim on appeal). Although mere attorney error or inadvertence will not ordinarily supply sufficient cause to excuse a procedural default, cause exists when an attorney's error is so egregious that he ceases to be an agent of the petitioner. *Jamison v. Lockhart,* 975 F.2d 1377, 1380 (8th Cir. 1992).

A showing that "some interference by officials made compliance impracticable" also constitutes cause under this exception. *Jamison,* 975 F.2d at 1380. Similarly, an attorney's actual conflict of interest will furnish sufficient cause for a procedural default. *Id.* (acknowledging the argument that the default of a conflict of interest claim can be caused by the conflict of interest violation itself). In that situation, the cause of the default would be actions or decisions by counsel that flow from his "divided loyalties," as opposed to the strategy or tactics of counsel, which are not external to the defense. *Id.*

The cause and prejudice standard applies to defaults on appeal. *Murray,* 477 U.S. at 49. If a procedural default is the result of constitutionally deficient assistance of trial or appellate counsel, the Sixth Amendment "requires that responsibility for the default be imputed to the state, which may not 'conduc[t] trials at which persons who face incarceration must defend themselves without legal assistance.'" *Murray,* 477 U.S. at 487

(*quoting Cuyler v. Sullivan,* 446 U.S. 335, 344 (1980)).  In order for ineffective assistance of counsel to itself be cause to excuse a procedural default, the ineffective assistance must rise to the level of an independent constitutional violation.  *Edwards v. Carpenter,* 529 U.S. 446, 451-52 (2000) (noting that counsel's ineffectiveness in failing to preserve a claim for state court review will suffice as cause, but only if that ineffectiveness itself constitutes an independent constitutional claim).  Also, an ineffective assistance claim must be presented to state courts before it may be used to establish cause for a procedural default.  *Id.*

To show prejudice, a petitioner must show a reasonable probability of a different result.  *See, e.g., Hall v. Luebbers,* 296 F.3d 685, 696 (8th Cir. 2002); *Parkus v. Delo,* 33 F.3d 933, 940 (8th Cir. 1994).  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Parkus*, 33 F.3d at 938.  When the defaulted claim is that counsel was burdened by an actual conflict of interest, the prejudice element is presumed.  *Jamison,* 975 F.2d at 1379.

### iii.    Fundamental Miscarriage of Justice

Under the narrow "fundamental miscarriage of justice" exception, no showing of cause is required in cases "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense."  *Dretke,* 541 U.S. at 394.  This narrow exception also applies to claims that a petitioner, although guilty of the underlying offense, is "actually innocent" of a sentence of death.  However, the Supreme Court has expressly declined to address the issue of whether the actual innocence exception also extends to noncapital sentencing error.  *Id.* at 393 (noting that for the most part, victims of a fundamental miscarriage of justice will meet the cause and prejudice standard and that the availability of ineffective assistance of counsel claims—either as a

ground for cause or as a freestanding claim for relief—further safeguard against miscarriages of justice). In the Eighth Circuit, "[i]f one is actually innocent of the sentence imposed, a federal habeas court can excuse the procedural default to correct a fundamentally unjust incarceration." *Jones v. Arkansas,* 929 F.2d 375, 381 & n.16 (8th Cir. 1991) (applying the "actual innocence" exception to a noncapital sentence); *see also Pilchak v. Camper,* 935 F.2d 145, 148 (8th Cir. 1991) (noting that it is difficult to conceive of a more "fundamentally unjust" situation than the imposition of a life sentence on a defendant who "was not the proper subject for a sentence of a lifetime of incarceration); *but see Embrey v. Hershberger,* 131 F.3d 739, 741 (8th Cir. 1997) (*en banc*) (finding actual innocence exception was not applicable to noncapital sentencing error in a § 2255 case). Decisions that bypass the cause and prejudice requirements are approached with trepidation, but "there are times, however, that justice requires a more expansive and compassionate application of the rules." *Pilchak,* 935 F.3d at 149.

## 2.    Analysis

The court first rejects the State's contention that Hunt's federal habeas corpus petition is successive. The record shows that the court's previous dismissal without prejudice to refiling is the functional equivalent of a "stay and abeyance" authorized by the Supreme Court in *Rhines,* 544 U.S. at 277. In finding that the earlier appeal of this case did not involve a final order, the Eighth Circuit implicitly approved the procedure followed in this case. *Hunt v. Hopkins,* 266 F.3d at 937.

The court next finds that Hunt has exhausted his claims of constitutional violations that relate to the altered report. He has presented the substance of his claims to state courts in two postconviction actions. There is no doubt that Hunt fairly presented his

claims to the state tribunals as federal constitutional claims—he argued violations of the Fifth and Sixth Amendments and cited federal cases.  The State has had the first opportunity to hear the federal constitutional claims.  Relying on the procedural principle that the court will not address an issue that could have been raised in an earlier proceeding, the Nebraska Supreme Court will not review the merits of Hunt's Fifth or Sixth Amendment falsified-report claims.  Hunt has no other vehicle by which to present the claims to Nebraska courts.  Any further exhaustion would be futile.

Last, with respect to the State's argument that Hunt's claims are procedurally barred, the court finds that Hunt has not defaulted his Fifth and Sixth Amendment claims that involve the doctored document.  *See Clemmons v. Delo,* 124 F.3d at 948.  Hunt presented the substance of his claims to the state courts in either his first or second petitions for postconviction relief, or both.  The substance and factual predicate for Hunt's constitutional claims were presented to the Nebraska lower court in his postconviction action.  The full record of the postconviction hearing was filed on appeal to the Nebraska Supreme Court.  Hunt argued the issue of structural error, albeit in the context of total absence of counsel, to the Nebraska Supreme Court in the postconviction appeal.  Hunt's broad references to due process, the right to a fair trial, and structural error in Hunt's first postconviction appeal, together with the strong evidence of misfeasance presented in the postconviction record, alerted the Nebraska Supreme Court to the substantial Fifth and Sixth Amendment violations in this case.  Hunt has presented evidence that his court-appointed postconviction counsel acted contrary to his client's wishes in the postconviction appeal.  Hunt also presented the falsified document evidence to Nebraska courts in his

second postconviction action, which was dismissed on procedural grounds.[12]  Hunt has clearly done everything in his power to present his claims involving the falsified evidence to state courts.

This situation is almost identical to that presented in *Clemmons v. Delo,* 124 F.3d at 948, in which the Eighth Circuit found that a claim that had been abandoned by postconviction counsel on appeal, in contravention of the defendant's instructions, had been fairly presented to the state courts and was not defaulted.  This is precisely the situation that federal habeas corpus relief is designed to remedy—providing an avenue for the redress of a constitutional harm that state courts would rather not address.  The court finds that Hunt's misconduct claims are not subject to a procedural default.

Alternatively, Hunt has shown that his claims have not been defaulted because the factual predicate for the misconduct, conflict of interest, and collusion claims was not available at the time of the default.  The falsified report allegations are leveled at the combined conduct of the prosecutor, the special prosecutor, defense counsel and the trial judge.  The allegations of prosecutorial misconduct could not have been raised on direct appeal because the fact and circumstances of the incident do not appear anywhere in the trial record.  The evidence suggests that the falsification was, in effect, concealed by the prosecutor, with the tacit or explicit agreement of defense counsel, from both the trial court and the appellate court.

The evidence of purposeful alteration of evidence was developed in the state postconviction proceedings in 1997, and the evidence of the trial judge's involvement

---

[12]As discussed further below, it was error for the Nebraska Supreme Court to dismiss the second postconviction action as successive.  The petition included claims, including allegations that Hunt's postconviction counsel and the postconviction court colluded in the deprivation of his constitutional rights, that were based on new evidence that could not have been discovered earlier.

and/or awareness of the incident was developed only in this proceeding.  The claim of trial court deficiencies in failing to investigate prosecutorial misconduct or conflicts of interest, and failing to make a record of the in-chambers meeting, as well as Hunt's allegation that the trial court actively participated in a collusive effort to protect the reputation of a member of the bar, could not have been presented until Hunt was provided an evidentiary hearing in this action.  The factual premise of Hunt's allegations with respect to the trial court's involvement was not fully known to Hunt until it became clear in the postconviction action that Judge Garden would not remedy the constitutional violation.  As noted, there is no mention of the incident anywhere in the trial record.  Similarly, evidence of postconviction counsel's alleged complicity was not available until after the postconviction action and appeal.  Accordingly, Hunt's misconduct claims rely on evidence that was not available at the time of the earlier proceedings.[13]

The court also finds that, even if Hunt defaulted these claims, the Nebraska procedural rules relied upon for the purported default are not adequate, in the circumstances of this case, to bar the consideration of his misconduct claims.  A failure to follow state procedures can operate to bar a federal habeas corpus remedy only if those procedures provide a habeas petitioner with a fair opportunity to seek relief in state court.  Ordinarily, the application of Nebraska procedural rules on successive petitions and abandonment of claims would arguably provide the procedural bar that would foreclose review by this court.  In the context of this case, however, they do not suffice.

---

[13]Although the evidence shows that Hunt was aware of some level of misconduct shortly after it occurred, he was not fully apprised of the nature and extent of Krepela's misconduct until he was able to physically compare the contrasting versions of Captain Chapman's report.  Both Thomas DeLay and Harry Moore testified that they could not fully appreciate the seriousness of the violation until they physically compared the two documents.

Nebraska law provides for a postconviction action to be filed in the county of conviction and it is accordingly likely and appropriate that a postconviction action will be heard by the trial judge in most cases.  However, when a defendant presents well-supported claims of misconduct, impropriety, and misfeasance on the part of the prosecution, defense counsel, and the trial court itself, the adjudication of those claims by the same judge who presided over the asserted improprieties does not provide an adequate remedy.  Postconviction counsel is obviously constrained in arguing that judicial malfeasance or prosecutorial misconduct occurred at a trial over which the same judge presided.  Accordingly, this case presents the situation in which the application of a generally sound rule is "exorbitant," that is, it exceeds the bounds of reason or moderation, and renders the state procedural ground inadequate to prevent the consideration of a substantial federal constitutional question.

Even if the procedural rule were adequate to invoke the procedural bar, Hunt has shown cause and prejudice to overcome the bar.  Hunt's trial counsel's ineffectiveness on direct appeal itself constitutes cause to excuse the procedural default.  As discussed later in this opinion, the performance of Hunt's counsel at trial and on direct appeal was constitutionally deficient.  The conduct rises to the level of an independent constitutional violation.  At least one example of constitutionally ineffective assistance was presented to state courts in Hunt's postconviction actions.  The court finds that Hunt has preserved his ability to argue ineffective assistance of appellate counsel as cause excusing procedural default.  It is clear that claims that trial counsel was constitutionally ineffective at trial could not have been raised on direct appeal because Hunt was represented by the same counsel in each action.  Counsel's failure to bring the misconduct to the attention of the Nebraska

44

Supreme Court on appeal amounts to ineffective assistance on direct appeal, a constitutional injury that provides cause to overcome the procedural bar.

The court also finds that Hunt has shown that external impediments furnish cause to overcome any procedural bar created by his counsel's supposed abandonment of the falsified report claims in the postconviction appeal.   Hunt alleges that the reason postconviction counsel did not pursue the claim on appeal was  postconviction counsel's own participation or complicity in the collusive effort to protect Krepela's reputation.  On this record, the court cannot find any merit to that allegation.   However, the evidence shows that postconviction counsel's decision to forego the misconduct claim on appeal was not a tactical or strategic decision, but was the result of interference external to the defense. The record shows that the postconviction court interfered with the development of facts of the case and the preparation of an adequate record, effectively preventing postconviction counsel from presenting the claim of prosecutorial misconduct to the Nebraska Supreme Court.

The record shows that Judge Garden was not receptive to either arguments or evidence concerning the falsified document.  He was, in fact, hostile to any mention of the falsified document incident, and to the suggestion that recusal would be appropriate. Judge Garden's finding that Krepela's motive for altering the document was irrelevant, and his corresponding evidentiary rulings, foreclosed the development of evidence that could arguably satisfy the prejudice component of Hunt's claim.[14]   Judge Garden's ruling that

---

[14]Importantly, development of evidence about Krepela's motivation for changing the report was relevant not only to the admissibility of the uncounselled statement in the second interview, but to the admissibility of the statements made in the first interview and to the probative value of other evidence.  The record shows that there was an issue at the time of trial about whether Hunt's request for an attorney at the close of the first interview was equivocal.  In the altered version of Chapman's report, Krepela omitted Hunt's statement that "I thought you and I agreed" that Hunt should have a lawyer.  The language omitted from the report of the second interview related to the statements Hunt made in the first interview, about which

Hunt had not been prejudiced effectively rendered his opinion "appeal-proof" in postconviction counsel's eyes. He could not argue on appeal that Hunt had been prejudiced because Judge Garden had not allowed him to present evidence that would show the prejudice.

Judge Garden's finding that Hunt was not prejudiced by the misconduct was based on his determination that "[n]either the trial nor any pretrial motion was affected by the altered report." Subsumed within that finding is the implication that Judge Garden would not have ruled any differently on Hunt's motion to suppress, or conducted the trial differently in any way, if he had known the extent of Krepela's misconduct at the time. Hunt's postconviction counsel based his appeal strategy on that implied representation by Judge Garden. Judge Garden has now testified in this court that he does not know how he would have ruled on Hunt's motion to suppress had he known of the misconduct.

Hunt has alleged misfeasance by Judge Garden in his capacity as both trial judge and postconviction judge, as well as improper conduct by the prosecutor who now sits as a judge. Because Judge Garden failed to recuse himself in the postconviction action, it was impossible for Hunt to develop a full record, which, by necessity, would have included the trial judge's testimony. Postconviction counsel was not able to produce evidence of any alleged complicity, involvement, or knowledge on Judge Garden's part in a case over which Judge Garden presided and at which a sitting judge of the same court was a primary witness. The subtle pressure not to challenge the integrity of a sitting judge, especially one in front of whom an attorney must practice, is undeniable. Evidence suggests that Judge

---

Chapman was permitted to testify at trial. Postconviction counsel was not permitted to pursue questioning along these lines at the postconviction hearing.

Garden either knew or should have known that his testimony was essential to resolution of these issues.

The court finds that the failure of postconviction counsel to pursue a substantial and well-supported claim on appeal is a reflection of the inherent conflicts and subtle pressures that characterize this case.  The facts appear to support a theory of tacit agreements between attorneys to protect the reputation of a fellow attorney.  Although the court does not find that postconviction counsel actively participated in any alleged collusive effort, his conduct on appeal, a reaction to the postconviction court's failure to appreciate or effectively respond to Krepela's misconduct, lends credence to the notion that external impediments inhibited his ability to present the issues.  Hunt has thus shown cause to overcome the procedural bar.  Prejudice has been shown in Judge Garden's admission in this court that he does not know how he would have ruled on the motion to suppress if he had known of the full extent of the prosecutor's misconduct.   Accordingly, the court finds Hunt's claims relating to Krepela's falsification of the report can be addressed by this court on the merits.

Hunt has not, however, demonstrated cause and prejudice for his failure to present the claims that are not based on the falsified report to the Nebraska Supreme Court either on appeal or in his first postconviction action.[15]   The court finds those claims are procedurally barred.  Although Hunt's other alleged instances of ineffective assistance or

---

[15]Those claims involve the consideration of Hunt's psychiatric reports at sentencing (Claim 9) and ineffective assistance of counsel in failure to present an insanity defense and in use of psychiatric reports (Claims 6, 7, and 8)

47

trial error are not freestanding claims for habeas corpus relief, evidence that relates to those claims can be considered in connection with other claims.[16]

### B.   Constitutional Claims

#### 1.   Law

##### a.   General Habeas Corpus Standards

United States District Courts may issue writs of habeas corpus on behalf of prisoners who are "in custody in violation of the Constitution of the United States."  28 U.S.C. §§ 2242(c)(3), 2254(a); *Peyton v.  Rowe,* 391 U.S. 54, 55 (1968).  The writ of habeas corpus is a procedural device for subjecting executive, judicial or private restraints on liberty to judicial scrutiny.  *Peyton,* 391 U.S. at 58 (stating that the writ of habeas corpus "assures among other things that a prisoner may require his jailer to justify the detention under the law").  The writ of habeas corpus plays a vital role in protecting constitutional rights.  *Slack v.  McDaniel,* 529 U.S. at 483.

Hunt filed his habeas corpus petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  28 U.S.C. § 2241-54.  Under the AEDPA, an application for writ of habeas corpus can be granted on a claim that was adjudicated on the merits in state court if the adjudication either resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2).  Under the "contrary to" clause of subsection (d)(1), a federal

---

[16]Specifically, this evidence shows the effect of the alleged conflicts of interest on counsel's performance at trial.

habeas corpus court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or "if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

The determination of a factual issue by a state court is presumed to be correct.  *See* 28 U.S.C. § 2254(e)(1).  A petitioner must rebut the presumption of correctness with clear and convincing evidence.  *Middleton v. Roper,* 455 F.3d 838, 854 (8th Cir. 2006); 28 U.S.C. § 2254(e).  A state court decision is an unreasonable determination of the facts if it is shown that the state court's presumptively correct factual findings are not supported by the record.  *Jones v. Luebbers,* 359 F.3d 1005, 1011 (8th Cir. 2004).  When a state court determines that a constitutional violation is harmless, a federal court may award habeas relief under § 2254 if the harmlessness determination itself was unreasonable. *Fry v. Pliler,* — U.S. —, —, 127 S. Ct. 2321, 2326 (2007)*.*

### b.   Structural Error/Harmless Error

The commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal; "'most constitutional errors can be harmless.'"  *Washington v. Recuenco,* 548 U.S. 212, —, 126 S. Ct. 2546, 2551 (2006).  To assess the prejudicial impact of trial-type federal constitutional error in a state-court criminal trial, federal courts determine whether the trial error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson,* 507 U.S. 619 , 638 (1993); *Fry v. Pliler,* — U.S. at —, 127 S. Ct. at 2325.  Under that standard, "habeas petitioners may

obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht,* 507 U.S. at 637.  The state bears the burden of persuasion on the question of prejudice. *Fry,* — U.S. at —, 127 S. Ct. at 2328 n.3.

The effect of constitutional trial errors, that is, errors that occur during presentation of the case to the jury, "may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.'" *United States v. Gonzalez-Lopez,* 548 U.S. 140, —, 126 S. Ct. 2557, 2563-64 (*quoting Arizona v. Fulminante,* 499 U.S. 279, 307-08 (1991)) (internal quotation marks omitted).[17]  In a normal case subject to harmless-error review, the error occurs at trial and its scope is readily identifiable.  *Satterwhite v. Texas,* 486 U.S. 249, 257 (1988)  (noting "the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury").

The second category of constitutional error involves "structural defects."  *Gonzalez-Lopez,* 548 U.S. at — n.4, 126 S. Ct. at 2564 n.4 (explaining trial error/structural defect dichotomy).  Structural errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence.  *Neder v. United States,* 527 U.S. 1, 8-9 (1999); *Washington v. Recuenco,* 548 U.S. at —, 126 S. Ct. at 2551 (noting that "[i]n such cases, the error 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'") (*quoting Neder,* 527 U.S. at 9).  In these rare cases, the error "will always

---

[17]In addition to the "difficulty of assessment" test, the Supreme Court has also relied on the irrelevance of harm to a defendant as a criterion for structural error.  *Gonzalez-Lopez,* 548 U.S. at —, 126 S. Ct. at 2564 n.4 (noting that "the right to self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis").

invalidate the conviction." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (involving a defective reasonable-doubt instruction); *see also Gonzalez-Lopez*, 548 U.S. at —,126 S. Ct. at 2562 (involving denial of counsel of choice); *Mickens v. Taylor,* 535 U.S. 162, 166 (2002) (involving conflicted counsel); *Young v. United States ex rel. Vuitton et Fils, S.A.,* 481 U.S. 787, 909 (1987) (plurality opinion) (involving the appointment of an interested prosecutor); *Vasquez v. Hillery,* 474 U.S. 254, 264 (1986) (involving racial discrimination in selection of grand jury); *Waller v. Georgia,* 467 U.S. 39, 49 (1984) (involving denial of public trial)*; Cronic,* 466 U.S. at 659 (involving failure of counsel to subject the government's case to meaningful adversarial testing); *Cuyler v. Sulllivan,* 446 U.S. at 344 (involving counsel burdened by an actual conflict of interest); *McKaskle v. Wiggins,* 465 U.S. 168, 174-76  (1984) (involving denial of self-representation at trial); *Gideon v. Wainwright,* 372 U.S. 335, 344 (involving denial of counsel); *Tumey v. Ohio,* 273 U.S. 510 (1927) (involving trial by a biased judge).

Structural defects "'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'" *Gonzalez-Lopez,* 548 U.S. at — n.4, 126 S. Ct. at 2564 n.4. (*quoting Arizona v. Fulminante,* 499 U.S. at 309-10 (1991)).  Error that results in consequences that are necessarily unquantifiable and indeterminate qualifies as structural error.  *See Gonzalez-Lopez,* 548 U.S. at —, 126 S. Ct. at 2565 (2006).  A conclusion of structural error rests "upon the difficulty of assessing the effect of the error."  *Id.* at 2564 n.4; *see also Waller,* 467 U.S. at 49 n.9 (1984) (violation of the public-trial guarantee is not subject to harmlessness review because "the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance"); *Vasquez,* 474 U.S. at 263 (selection of a petit jury

on improper criteria or exposure of the jury to prejudicial publicity can require reversal "because the effect of the violation cannot be ascertained"); *Mickens,* 535 U.S. at 168 (conflicts of interest effectively "seal counsel's lips on crucial matters" and "make it difficult to measure the precise harm arising from counsel's errors").

In a case involving a structural error, "the evil—it bears repeating—is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process." *Satterwhite,* 486 U.S. at 257 (*quoting Holloway v. Arkansas,* 435 U.S. 475, 490-91 (1978)). "Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." *Gonzalez-Lopez,* 548 U.S. at —, 126 S. Ct. at 2565 (stating that an assessment of prejudice in structural defect cases is speculative).

Cases that involve a constitutional error that infects the entire proceeding will "warrant the grant of habeas relief, even if [the trial error] did not substantially influence the jury's verdict." *Brecht,* 507 U.S. at 638 n.9: *see also Fry,* — U.S. at —, 127 S. Ct. at 2325 (noting exception from *Brecht* standard for "the 'unusual case' in which 'a deliberate and especially egregious error of the trial type or one that is combined with prosecutorial misconduct . . . infect[s] the integrity of the proceeding'") (*quoting Brecht,* 507 U.S. at 638 n.9); *Williams v. Taylor,* 529 U.S. at 375 (noting that "it is well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason" for granting habeas corpus relief, "errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ") (citations omitted).

### c.      Fifth Amendment - Prosecutorial Misconduct

The prosecutor plays a special role in the search for truth in criminal trials.  *Strickler v. Greene,* 527 U.S. 263, 281 (1999).   Within the federal system "the United States Attorney is 'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'"  *Id.* (*quoting Berger v. United States,* 295 U.S. 78, 88 (1935)).  "Courts, litigants, and juries properly anticipate that 'obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed'" and "[a] prosecutor's dishonest conduct or unwarranted concealment should attract no judicial approbation."   *Banks v. Dretke,* 540 U.S. at 694, 696 (*quoting Berger,* 295 U.S. at 88).

At the time of Hunt's conviction, clearly established law determined by the Supreme Court provided that prosecutorial misconduct, such as the use of perjured testimony or other governmental corruption of the truth-finding process, can result in a deprivation of fundamental due process.   *Ray v. United States,* 588 F.2d 601, 603 (8th Cir. 1978); *see also United States v. Agurs,* 427 U.S. 97, 103 (1976); *Giglio v. United States,* 405 U.S. 150, 153 (1972); *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *see also Banks v. Dretke,* 540 U.S. 668, 694 (2004) (stating "[i]t has long been established that the prosecution's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice") (quotation omitted).   A prosecutor with conflicting loyalties presents the opposite of the appearance of justice.   *Young,* 481 U.S. at 811.  Accordingly, a concern for actual prejudice in cases of prosecutorial misconduct

53

or misuse of power "misses the point for what is at stake is the public perception of the integrity of the criminal justice system." *Id.* When specific guarantees of the Bill of Rights, such as the right to counsel, are involved, special care should be taken to assure that "prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974).

In cases involving less egregious prosecutorial misconduct in the nature of a failure to disclose exculpatory evidence, favorable evidence will be considered material "and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley,* 514 U.S. 419, 433 (1995) (*quoting United States v. Bagley,* 473 U.S. 667, 682 (1985)).   Notably, the "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important . . . [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434.  "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (*quoting Bagley,* 473 U.S. at 678).

In contrast, in cases that involve "prosecutorial misconduct or 'a corruption of the truth-seeking function of the trial process,'" a strict standard of materiality, under which perjured testimony is considered material unless the government shows that failure to

disclose it would be harmless beyond a reasonable doubt, is justified.[18]  *Bagley,* 473 U.S. at 680 (*quoting Agurs,* 427 U.S. at 104); *see also United States v. Eizember,* 485 F.3d 400, 404 (8th Cir. 2007) (stating, in the related context of juror misconduct, that prejudice is presumed and the burden is on the government to prove beyond a reasonable doubt that the inappropriate activity did not harm the defendant).  A conviction obtained by egregious misconduct, such as the knowing use of perjured testimony, is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.  *Bagley,* 473 U.S. at 678*; Agurs,* 427 U.S. at 103.

### d.    Sixth Amendment - Ineffective Assistance of Counsel

At the time of Hunt's conviction and its affirmance on appeal, a long line of Supreme Court cases established that the Sixth Amendment right to counsel protects the fundamental right to a fair trial.  *See, e.g., Gideon,* 372 U.S. at 334; *Johnson v. Zerbst,* 304 U.S. 458, 462-63 (1938); *Powell v. Alabama,* 287 U.S. 45, 57-58 (1932).  Shortly before Hunt's trial, the Supreme Court recognized that "[t]he right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled."  *Strickland v. Washington,* 466 U.S. at 687-88 (noting that the role an attorney plays is "critical to the ability of the adversarial system to produce just results").  In *Strickland,* the Supreme Court held that the Sixth Amendment envisions "reasonably effective" legal assistance, and it announced a now familiar test:  A defendant claiming ineffective assistance of counsel must show:   (1) that counsel's

---

[18]This standard for the knowing use of perjured testimony is substantively the same standard that is applied to constitutional error on direct review.  *United States v. Bagley,* 473 U.S. at 679 n.9 (noting similarity to "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California,* 386 U.S. 18 (1967)).

representation "fell below an objective standard of reasonableness"; and (2) that counsel's deficient performance prejudiced the defendant. *Id.* at 687-88, 694. To meet that standard, a defendant must generally show that his trial counsel's performance fell below the standard of customary skill and diligence that a reasonably competent attorney would display and that there is a reasonable probability that the outcome would have been different but for the substandard actions of counsel. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Supreme Court acknowledged in *Strickland,* however, that "[i]n certain Sixth Amendment contexts, prejudice is presumed." *Id.* at 692 (stating that "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice," as are "various kinds of state interference with counsel's assistance"). The complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice because "the adversary process itself" has been rendered "presumptively unreliable." *Cronic,* 466 U.S. at 659. Prejudice is also presumed when counsel fails to subject the government's case to meaningful adversarial testing. *Id.; see also Mickens*, 535 U.S. at 166 (noting the defendant is spared the need of showing probable effect on the outcome where assistance of counsel has been denied entirely or during a critical stage of the proceeding and in other "circumstances of that magnitude").

A claim that counsel was burdened by an actual conflict of interest warrants a "similar, though more limited, presumption of prejudice." *Cronic,* 446 U.S. at 692 (noting that those circumstances involve breaches of the "the duty of loyalty, perhaps the most basic of counsel's duties"); *United States v. Edelmann,* 458 F.3d 791, 806-07 (8th Cir. 2006) (noting that the constitutional right to counsel includes the correlative right to

representation that is free from conflicts of interest); *see also Holloway v. Arkansas,* 435 U.S. at 490 (establishing presumption that a conflict involving joint representation of codefendants, over objection, undermines the adversarial process). Prejudice is presumed in a conflict of interest situation if the defendant demonstrates an actual conflict, that is, "that counsel 'actively represented conflicting interests.'" *Cronic,* 446 U.S. at 692 (*quoting Cuyler,* 446 U.S. at 335, 348, 350). Thus, to warrant habeas corpus relief, a petitioner must establish that his attorney had an "actual conflict of interest," meaning "a conflict that affected counsel's performance–as opposed to a mere theoretical division of loyalties." *Mickens,* 535 U.S. at 168; *Cuyler v. Sullivan,* 446 U.S. at 348. An actual conflict "is a conflict of interest that adversely affects counsel's performance." *Mickens,* 535 U.S. at 172 n.5 (noting that the determination of "actual conflict" is not separate inquiry from the determination of adverse effect). "An actual conflict occurs 'when, during the course of the representation, the attorney's and the defendant's interest diverge with respect to a material factual or legal issue or to a course of action.'" *Edelmann,* 458 F.3d at 807 (*quoting United States v. Levy,* 25 F.3d 146, 155 (2d Cir. 1994)).

When the trial court knows or reasonably should know that a particular conflict exists, a trial court has a duty to inquire into the propriety of the representation.[19] *Mickens,* 535 U.S. at 168. When the trial judge is unaware of the conflict (and thus not obligated to inquire), prejudice will be presumed only if the conflict has significantly affected counsel's

---

[19]When a court discovers that a criminal defendant's attorney suffers from an actual or potential conflict, "the court has a subsequent 'disqualification/waiver' obligation." *Mickens,* 535 U.S. at 168. If the court discovers that the attorney suffers from a severe conflict—such that no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation—the court is obligated to disqualify the attorney, but if the conflict is only a potential conflict—"such that a rational defendant could knowingly and intelligently desire the conflicted lawyer's representation"—the court should obtain from the defendant a valid waiver of his right to a non-conflicted lawyer. *Id.*

performance—thereby rendering the verdict unreliable, even though prejudice under *Strickland* cannot be shown. *Id.* at 173. Conversely, if a petitioner cannot meet his burden to show that counsel's performance was adversely affected, he must demonstrate prejudice under *Strickland* in order to prove that the conflict resulted in a Sixth Amendment violation. *See Edelmann,* 458 F.3d at 807.

### 2.   Analysis

### a.  Fifth Amendment - Prosecutorial Misconduct

The court finds that Hunt has shown that prosecutorial misconduct in his trial has resulted in a Due Process violation. The court first finds that Richard Krepela's improper acts were exceedingly egregious.[20] Krepela admitted that he falsified an important piece of evidence, one that involved both the invocation of Hunt's constitutional right to an attorney and evidence of a statement concerning the crucial element of premeditation, before turning it over to defense counsel. In Krepela's disciplinary proceeding, the Nebraska Supreme Court made the factual finding that Krepela had not only falsified a document, but had asked a law enforcement officer to tamper with evidence. That factual finding is afforded deference, and this court has not been presented with credible evidence to the contrary. Krepela's acts (evidence tampering, attempt to influence the testimony of a witness, obstruction of justice and subornation of perjury) could arguably have been prosecuted as felonies. The fact that Krepela's scheme was foiled before it could be fully carried out does not diminish the gravity of his violation.

---

[20]The Nebraska Supreme Court came to essentially the same conclusion in Krepela's disciplinary proceeding. That Richard Krepela's subsequent conduct has apparently redeemed the transgression has no bearing on the issue of the fairness of Hunt's trial.

Though Krepela continues to characterize his acts as "withholding" of evidence, the court finds there is a qualitative difference between failing to reveal or turn over evidence, that is, a *Brady*-type violation, and actively creating false evidence to gain an advantage in a prosecution. The purposeful alteration of evidence by a prosecutor is as serious a violation as this court can envision. The misconduct involves a corruption of the truth-seeking process and infects the integrity of the entire proceeding. This conduct by a prosecutor cannot be countenanced.

The court finds Krepela's conduct amounts to a structural error. His actions are far more serious than a mere discovery violation or a failure to disclose exculpatory information.[21] His conduct is equally as egregious as knowing use of perjured testimony. The prosecutorial misconduct that occurred in Hunt's trial necessarily renders his trial fundamentally unfair. The trial has been shown to be an unreliable vehicle for the determination of Hunt's guilt or innocence of first-degree murder. Prosecutorial misconduct of this nature constitutes a structural error for which a determination of prejudice would be a speculative inquiry into "what might have happened in an alternate universe."

The injury or harm to Hunt caused by the prosecutor's misdeed cannot be assessed or quantified. The trial record contains no mention of the incident whatsoever. The alteration of the police report was not mentioned either at the hearing on Hunt's motion to suppress or at trial. No reason for the appointment of James Smith as special prosecutor appears in the record. The fact that a prosecutor had attempted to falsify evidence was

---

[21]Even if Krepela's misconduct were somehow viewed as similar to a *Brady*-type violation, the court would find that there is a reasonable probability that the result would have been different if the prosecutorial misconduct had been fully disclosed to the trial court, presented at trial, and preserved in the record. The reasonable probability of a different outcome is enough to undermine the court's confidence in Hunt's conviction for first-degree murder.

not presented to the court for any *in camera* evaluation.  No witnesses were subjected to any examination about the incident.  No effort was made by any party or the court to investigate other possible misconduct.  The trial judge has now testified that he does not know what he would have done on Hunt's motion to suppress if he had known the nature and extent of the misconduct.  The error created by the misconduct and the attempts to conceal it affected the entire framework of the trial.  It is precisely the difficulty of ascertaining the injury or harm to the defendant that demonstrates that a structural violation has occurred.

The record shows that Krepela was highly motivated to obtain a conviction.  He felt very strongly about the case.  The Nebraska Supreme Court found that it was not "a fear of getting caught that made [Krepela] want to confess, but a realization that his actions would make Chapman appear to be a bad witness."  He also knew that defense counsel was a formidable opponent and testified that he told the special prosecutor to do whatever he had to do to win the case.  Because he knew that his transgression had the potential to "screw up the case," Krepela had an interest in concealing the details of the alteration of the police report.

Further, the evidence shows that Krepela, Smith, and DeLay were less than forthright in informing the trial court of the exact nature of the misconduct.  The affidavit that DeLay offered to establish foundation for the use of Chapman's report in the pretrial motion was disingenuous; it made it appear that the only prosecutorial misdeed had been a delay in turning over the reports.

It is not unreasonable to assume that a prosecutor who would falsify one piece of evidence would falsify another.  The fact that a prosecutor attempted to tamper with a law

enforcement officer's contemporaneously recorded recollection of a purported admission necessarily affects the credibility of the other police officers' recorded recollections. Especially in view of Krepela's admitted involvement in the investigation, his presence at the crime scene, and his behind-the-scenes participation in Chapman's interrogations (a fact that he attempted to conceal from defense counsel in the doctored document), it calls into question whether the actions of other police officers, such as the tardy administration of *Miranda* warnings, could have been orchestrated by Krepela.[22]  Krepela's misconduct calls all of the evidence into question—because the misdeeds were not disclosed and no investigation ever took place, it is impossible to know what effect the disclosure would have had on the course of the trial.[23]

Once the misconduct occurred, the prosecutors operated under an actual conflict of interest in prosecuting the case.  The prosecutors' duty to see that justice is done was at odds with their interest in concealing Krepela's misdeed.  The conflicted loyalties of the prosecutors creates another instance of structural error, undermining the fundamental fairness of the trial.  Krepela was never formally removed from the case and in fact made an appearance at Hunt's sentencing.  The record shows that Krepela was actively involved in the Norfolk Police Department's investigation of the murder, and that he participated in Chapman's interrogations from behind the scenes, offering advice to Captain Chapman.

---

[22]DeLay's assertion that the other police officers corroborated each other's testimony on Hunt's admission does little to dispel any notion of department-wide corruption; whereas, a hearing on the issue at the time could have.  Judge Garden's finding that there was no evidence of other misconduct is also of little value.  There is similarly no evidence that any such misconduct had <u>not</u> occurred.

[23]Krepela's self-serving testimony that he did not tamper with other evidence or perform any other inappropriate or improper acts is not particularly probative, especially in light of the fact that he did not disclose the incident when first nominated to the bench.  His continued downplaying of the incident as a "failure to disclose" rather than a purposeful misrepresentation also injures his credibility.  His characterization of the incident is either disingenuous or shows an underappreciation of the gravity of the misconduct.

After the special prosecutor was appointed, Krepela continued to have some level of involvement in the prosecution, at the least to discuss it with Smith.

James Smith, the Special Prosecutor, also operated under a conflict of interest. He was not an independent prosecutor. He appeared under the auspices of the Madison County Attorney's Office. Smith was a former Deputy Madison County Attorney who had worked for or with Krepela in the past. He had reason to protect the reputation of the office. He also maintained a friendship with Krepela and had reason to shield Krepela from criticism. Smith was hand-picked by Krepela to be the special prosecutor. Smith's duty as a prosecutor to see that justice is done was compromised by these actual and perceived conflicts.

Although he may not have been aware of specifics, the evidence shows that the information that was provided to the trial judge in the off-the-record meeting was sufficient to have triggered a duty on the part of the court to inquire into actual or potential conflicts presented in the scenario. The trial judge knew that there had been some failure by the prosecutor to provide discovery or exculpatory evidence to the defense and also knew that the county attorney sought the appointment of a special prosecutor.

The structural error was compounded by the acts of the trial judge. Judge Garden neglected to ascertain the truth of the matter and to make a record of the prosecutor's misfeasance, at whatever level of culpability. The off-the-record, closed meeting outside the defendant's presence lends itself to the appearance of a secret or conspiratorial arrangement. The prosecutor's misconduct has not been subjected to any examination or adversarial or judicial testing. The jury was never informed that a Madison County

Attorney had attempted to falsify evidence, which could have affected the probative value and credibility of much of the evidence presented at trial.

Krepela's conduct was concealed from reviewing courts and from the public until the hearing on Hunt's postconviction action.  It might never have been revealed were it not for Krepela's appointment to the bench and Hunt's dogged pursuit of the claim.  Notably, Krepela did not divulge the incident at the time of his judicial appointment in 1989.  This failure to fully inform the court, failure to make a record of the improper conduct, and subsequent failure to divulge the incident to the Nebraska Bar Association, judicial nominating authorities, or the press creates a reasonable inference that some tacit or explicit collusive effort was made to ensure the incident did not become public.  The court cannot know what the prosecution and/or defense did or refrained from doing as advocates for their respective clients as a result of their mutual motivation to protect Krepela's career and to cover up his inappropriate actions.

### b.    Sixth Amendment - Ineffective Assistance of Counsel

With respect to Hunt's claim that his counsel was ineffective in making improper and inflammatory statements in closing argument, the court agrees with the Nebraska Supreme Court that counsel's inflammatory remarks at closing, standing alone, do not present a freestanding constitutional claim for ineffective assistance of counsel.  Given the expansive definition of the bounds of reasonable competence, DeLay's closing argument arguably meets the standard of customary skill displayed by a reasonably competent attorney.  DeLay's tactics could be considered a viable trial strategy to obtain the goal of achieving a second-degree murder conviction. The court cannot say that the inflammatory closing, in itself, would amount to a "total absence of counsel."  However, the claim cannot be

63

considered outside the context of Hunt's defense counsel's deficiency in dealing with the prosecutor's falsification of the police report. The issues are intimately connected. [24]

The court finds structural error in defense counsel's representation of Hunt at trial and on appeal while under an actual conflict of interest. The record shows that DeLay's loyalties were divided and that these divided loyalties adversely affected his performance. DeLay's inflammatory closing argument furnishes one example of the adverse effect the conflict had on his performance. Also, defense counsel clearly knew of the prosecutor's misdeed but failed to investigate, report, or preserve a record of the misconduct. In his admitted effort to shield the reputation of another attorney, DeLay participated in an off-the-record meeting, failed to ensure that a record of the proceeding was made, failed to preserve any error related to the event in the record, and failed to fully disclose the extent of the misconduct to the trial court or to his client. Although DeLay testified that he regarded Krepela's conduct as unethical, he failed to insist on Krepela's removal from the case or to report the misconduct to the Bar Association.

Importantly, DeLay did not use Krepela's conduct to undermine the credibility of the prosecution's evidence. Because the jury was never made aware of the prosecutor's misconduct, there is no way to know how the misconduct would have affected its verdict. The crucial determination for the jury in the trial was premeditation. Krepela's egregious misconduct involved evidence that went straight to the strength of the prosecution's case, since the case was largely dependent on admissions Hunt made to various police officers.

---

[24]In a vacuum, the prosecutor's closing remarks could be seen as a reasonable tactic to focus the jury's attention on the important distinction between first- and second-degree murder. In the context of the facts revealed in the postconviction proceedings, defense counsel's inflammatory remarks and other conduct (including failure to present an insanity defense and admission of the elements of manslaughter and second-degree murder) show that the trial counsel's conflicted loyalties affected his performance.

DeLay testified that he thought that revealing Krepela's misconduct to the jury would only serve to enhance Chapman's credibility. Although that might have been the case, it is equally plausible that disclosure of the fact of the prosecutor's misconduct or of Krepela's improper and overzealous manipulation of evidence would have negatively impacted the prosecution's case in general and would have impugned the credibility of other law enforcement witnesses. Without any investigation or any *in camera* inquiry by the court, no reviewing court can determine if the prosecution's case was tainted in other respects.

The transcription of DeLay's conversation with Hunt shortly after he was made aware of the falsification of evidence shows that DeLay appreciated the leverage the misconduct would potentially provide in plea negotiations, yet he was not able to negotiate a plea to second-degree murder. DeLay's other arguable deficiencies, such as admission of the elements of second-degree murder and failure to present an insanity defense, also furnish evidence of the detrimental effect his divided loyalties had on his performance as an advocate for Hunt and as an adversary to the government.

As a result of DeLay's conflicted loyalties, the prosecution's case was not subjected to meaningful adversarial testing. In the order denying postconviction relief, Judge Garden found no proof of prejudice to Hunt by reason of the incident. Hunt's postconviction counsel also cited the difficulty of proving prejudice as a reason to forego the issue on appeal. Again, it is the difficulty in quantifying the constitutional injury to the defendant that shows that a structural error has occurred. Because there is no record of the incident in the trial or appellate record, it is impossible to quantify the actual damage that may have been done.

The court finds that the state postconviction court's failure to afford a presumption of prejudice to Hunt's claims resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established law as determined by the Supreme Court. Nebraska courts erred in focusing on the product of the prosecutor's misconduct, the physically altered document itself, as the constitutional violation and, consequently, in concluding that because the document was not offered in evidence, the error was somehow cured.  The constitutional defect in Hunt's trial was not only the misconduct, but the ensuing efforts to cover it up.  It is the failure to disclose the misconduct that taints the entire trial and gives rise to the constitutional deprivation in this case.

### 3.    Error in Denial of Hunt's Motion to Suppress

The claim of constitutional error in the denial of Hunt's motion to suppress (Claim 1) is inextricably tied to Hunt's claims of prosecutorial misconduct and ineffective assistance of counsel discussed above.  The trial court's denial of Hunt's motion to suppress is part and parcel of the overall due process and deprivation of counsel violation. On direct appeal and in Hunt's first postconviction action, the Nebraska Supreme Court assumed that the denial of the motion to suppress Hunt's second statement to Captain Chapman was error, but found the error harmless.  Judge Garden's testimony that the outcome of the suppression hearing might have been different if he had known of the nature and extent of the violation at the time of the hearing calls that conclusion into question.

Presumably, an awareness of the nature and extent of Krepela's misdeed would have had some effect on the trial judge's assessment of the credibility of witnesses at the suppression hearing.  Knowledge of Krepela's misconduct would have affected the trial court's assessment of the police officers' credibility with respect to all of Hunt's purportedly voluntary statements.  Also, Hunt's counsel's trial strategy was developed in reliance on Judge Garden's pretrial finding that the most damaging of Hunt's statements of intent

would be admitted.  It is not possible to gauge whether the trial or plea negotiations would have proceeded differently had the most damaging evidence been excluded from the outset.   Accordingly, the court's finding of structural error on Hunt's prosecutorial misconduct and ineffective assistance claims is dispositive of Hunt's claim of error in the denial of his motion to suppress.  The finding by Nebraska courts that the error was harmless is an unreasonable application of clearly established federal constitutional law.

## III.  CONCLUSION

Whether Hunt's claims are characterized and analyzed under the Fifth Amendment as a violation of Hunt's right to due process or under the Sixth Amendment for violation of his right to effective assistance of counsel, Hunt has presented clear and convincing evidence that he was denied a fair trial.[25]  The court finds that Hunt's conviction was the result of a trial that was conducted in contravention of principles of Fifth and Sixth Amendment law that were clearly established at the time of his conviction.  State court findings that the error was harmless were contrary to or an unreasonable application of clearly established federal constitutional law.

The evidence presented to this court shows that prosecutorial misconduct, ineffective assistance of counsel, judicial misfeasance, and numerous improprieties and conflicts of interest have resulted in a structural error.  The actions by the prosecution, defense counsel, and the trial court have consequences that are necessarily unquantifiable and indeterminate and that bear directly on the framework of the trial.

---

[25]The Fifth and Sixth Amendment inquiries overlap.  "'The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause.'" *Gonzalez-Lopez,* 548 U.S. at —, 126 S. Ct. at 2562 (*quoting Strickland,* 466 U.S. at 684-85) (also noting that the right to effective representation is derived from the purpose of ensuring a fair trial).

All of the participants in the trial and the subsequent proceedings labored under considerable conflicts of interest.  Postconviction counsel Moore alleged impropriety on the part of two judges in front of whom he regularly practiced.  Judge Krepela had originally hired Madison County Attorney Joseph Smith.  Smith had worked with Krepela, and would have to appear before Krepela in the future.  Judge Garden had appointed Madison County Public Defender Moore.   Judge Garden had an inherent conflict in the postconviction action in ruling on allegations of misconduct by a fellow judge of his court.  Also, Judge Garden could not have been impartial in ruling on allegations of his own negligent, inappropriate or improper conduct in Hunt's trial.  Judge Garden's hostility to Hunt's position is apparent from the record of the postconviction proceeding.   The postconviction record shows that Hunt's allegations of conspiracy and secret agreements are not frivolous or far-fetched.

The evidence supports an inference that the prosecution and defense either explicitly or tacitly agreed to protect Krepela's reputation.  The trial court facilitated the conduct by failing to make a record of what had transpired.  Because the proceeding at which the incident was disclosed was not open or recorded, it is impossible to quantitatively assess the effect of the prosecutor's misconduct in the context of other evidence presented at trial.  Thus, no reviewing court can have confidence in the verdict.

In spite of the egregious nature of the prosecutor's misconduct, his misdeed need not have been fatal to the prosecution's case.  If the episode had been fully disclosed to the court and to the defendant and subjected to a searching examination to determine the effects of the misconduct on the government's case, a structural error could have been avoided.   The appointment of a truly disinterested and impartial special prosecutor,

68

Krepela's removal from the case, and a hearing or investigation concerning the reliability of other evidence would have remedied the violation and allowed reviewing courts to assess any resulting trial or constitutional error.  Such an on-the-record examination would have permitted the courts to determine whether the incident was a one-time misstep or was indicative of a level of corruption that pervaded the entire case.

As this record stands, the court is unable to make such a determination and must conclude that the combined conduct of the prosecution, defense, and the trial court rendered the adversarial process in this case unreliable.  Hunt was effectively denied the "meaningful adversarial testing" of the prosecution's case that the Constitution requires to ensure a fair trial.[26]

The postconviction court's application of the *Strickland* standard, rather than the presumed prejudice standard of *United States v. Cronic,* in the circumstances of this case, resulted in a decision that was an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.  Accordingly, the court finds that Hunt's petition for habeas corpus relief should be conditionally granted.  Hunt's conviction will be vacated unless, within 180 days of the date of this order, the State of Nebraska affords him a new trial.

Dated this 26th day of March, 2008.

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Judge

---

[26]The court once again notes that the trial record contains ample evidence, physical and testimonial, that Hunt murdered Beverly Ramspott.  The assessment of fairness relates to whether the murder was premeditated.